No. 105,420

STATE OF KANSAS, *Appellee*, v. AUSTIN N. JONES, *Appellant*.
(311 P.3d 1125)

Opinion filed November 8, 2013.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, chief appellate attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Austin N. Jones appeals his jury conviction of two counts of first-degree murder. He argues for the first time on appeal that under Kansas' version of a "Stand-Your-Ground Law" in effect at the time of the crime, K.S.A. 21-3219, he is immune from prosecution. In the alternative, he alleges that prosecutorial misconduct deprived him of a fair trial.

## FACTUAL AND PROCEDURAL BACKGROUND

It is undisputed that defendant Austin N. Jones shot and killed

Emmanuel Delatorre and Jesus M. Esparza in a parking lot outside of Jones' apartment on July 2, 2009.

Jones went to his friend Adrian Rodriguez' apartment to "hang out" in the afternoon before the shooting. The apartment had been leased in Jones' name; but Jones allowed Rodriguez to live there after Jones moved into his girlfriend's apartment in the same complex. Jones had brought a .45 caliber pistol he was interested in selling to Rodriguez. Although Rodriguez expressed interest, he said he could not afford the gun at that time. Jones placed the pistol in his waistband.

Later in the afternoon, sisters Jessica and Lindy Vestering arrived. A short while later, Josh Johnson and Esparza also arrived. Rodriguez, Johnson, and Esparza were recording rap songs while Jones and the Vestering sisters played drinking games. The group drank brandy and beer.

Meanwhile, Delatorre and Johnny Nash were drinking beer at Nash's dad's residence. The pair then went to a sports bar and consumed more beer. They then decided to go to another bar, but Delatorre wanted to stop by his apartment first. Delatorre's apartment was in the same complex as Jones'. Delatorre also wanted to see Esparza, another resident of the same complex.

Before they reached the apartment complex, Delatorre told Nash that he was upset with Jones because he had heard that Jones assisted Delatorre's estranged girlfriend in moving out of the apartment she shared with Delatorre. Delatorre had also heard that Jones received an entertainment center from the apartment. Delatorre told Nash that he wanted to ask Jones whether he had helped the girlfriend. If he had, Delatorre said, he was going to "beat [Jones'] ass."

When Delatorre and Nash reached the apartment complex, they encountered Rodriguez and Esparza in the parking lot. Rodriguez told Delatorre to go get some beer from his refrigerator. Delatorre entered the apartment and saw Jones sitting on a couch.

At this point in the chronology of events, the participants' descriptions of what transpired diverge.

Jones would eventually testify that Delatorre "slammed open" the door to the apartment and asked, "[W]here the fuck is

[Jones?]" Jones described Delatorre as "angry" and saying, "I'm going to beat your ass." Jones said Delatorre tried to fight with him in the apartment, but Jones stood up and said, "I don't want any problems with you. I don't want to fight." Jones also claimed that Delatorre continued "cussing [him] out, and saying he was going to beat [his] ass." According to Jones, this confrontation lasted 2 to 3 minutes.

Jessica Vestering would eventually testify that Delatorre and Jones began talking with each other "like friends talk" after Delatorre entered the apartment. Although she could not hear exactly what they were saying, she said, "It wasn't mean or anything like that." On cross examination, however, she acknowledged that she had told police shortly after the shooting that Delatorre was "mad" about something. According to her, after the conversation between Delatorre and Jones, Delatorre announced that he was leaving and did so. Rodriguez and Esparza, who had followed Delatorre into the apartment, also left. Jessica Vestering said that she too left the apartment and met her sister and Johnson outside, leaving Jones alone in the apartment. Jones came outside "almost right after" she did, and he was holding a gun in his hand. She said that she heard two shots and saw two flashes of light, but she did not actually see the shooting.

Lindy Vestering would eventually testify that she and Johnson had left the apartment because she "was getting too drunk." She talked with Nash for a couple minutes when he and Delatorre pulled into the parking lot. Shortly after that conversation, as she was walking back to the apartment, Jones walked out of the apartment and past her. Jones "ignored" her and "didn't even acknowledge" her when she said something to him. Moments later she heard gunshots.

Rodriguez would eventually testify that, once inside the apartment, Delatorre began "[a]rguing with [Jones] or something." After Jones and Delatorre argued for "a little bit," Rodriguez walked Delatorre and Esparza out of the apartment. The three had met Nash in the parking lot, when, "less than a minute" later, Jones came outside. Rodriguez said that Jones raised his hand, and then Rodriguez heard shots.

Johnson would eventually testify that Delatorre, Esparza, and Nash "circled around" Jones and "were talking shit." At one point, according to Johnson, Nash reached for his pocket. Johnson said he heard Nash say, "I'm going to kill you," and Delatorre punched Jones. Johnson had not told detectives about Nash's statement or Delatorre's punch. He did tell detectives that Jones looked down at Delatorre and Esparza after shooting them and said, "[F]uck you." At trial, Johnson said he could not remember this part of his earlier account.

Nash would eventually testify that he waited outside while Delatorre went into the apartment. Nash estimated that Delatorre was in the apartment for "about 2 minutes." When Delatorre came back outside, he told Nash about the argument inside with "that pussy" Jones. Nash told Delatorre that he should "beat [Jones'] ass" and encouraged him to fight. Despite this, Nash said that the members of the entire group generally had been friendly with one another and that they occasionally settled disputes by boxing and then drinking beer together. According to Nash, Esparza convinced Delatorre to "let it drop" and said there was no need to fight because "[Jones] is our friend." Nash also said that Jones appeared and shot Delatorre and Esparza before he, Delatorre, and Esparza could leave to go to a local bar as the three of them had planned. Nash said he ran away as Jones shot at him.

Autopsies revealed that Delatorre died as a result of a gunshot wound to the back of the head, and Esparza died from a gunshot wound to the rear side of the head. The autopsies also showed that Delatorre had a blood alcohol content between .14 and .17 grams, and Esparza had a blood alcohol content between .07 and .11 grams. Delatorre's autopsy did not reveal any bruises, blunt force injury, or other evidence that he was "fighting with his knuckles."

The State charged Jones with two counts of first-degree murder, see K.S.A. 21-3401(a); one count of aggravated assault, see K.S.A. 21-3410(a); and one count of criminal possession of a firearm, see K.S.A. 21-4204(a)(3).

Jones was the only witness to testify in the defense case. He said he shot Delatorre and Esparza in self-defense. According to Jones, Delatorre, Esparza, and Nash surrounded him when he went out-

side after the argument in the apartment. Delatorre then punched him in the face, and someone else hit him from behind. After being hit, Jones said, he reached into his waistband and pulled out the gun he had tried to sell to Rodriguez. Jones said, "I shot once in front of me and I shot once behind me." He also said that he pulled out the gun because he was in fear for his life. Jones' testimony at trial contrasted with the content of his first interview with detectives after the shooting; at that time he said he could not remember what had happened.

It is undisputed that, after shooting Delatorre and Esparza, Jones fled in his truck, which hopped a curb and collided with a tree. When an officer arrived at the scene of the accident, Jones ran. The officer pursued Jones on foot, and, approximately 50 yards from the truck, Jones stumbled, fell, and was apprehended.

The State's closing arguments were split between two prosecuting attorneys. One delivered the opening segment and a second, the rebuttal segment.

During the opening segment, discussing premeditation, the first prosecutor said: "How about when he pulls the five-pound pressure on that trigger to make that gun discharge[?] How about then[?] Yes." During rebuttal, the second prosecutor said: "How long does it take to think over a plan[?] It depends. It depends. That's what premeditation is about. But in this instance we know he had a gun, we know he walked out and put—raised his arm and pulled the trigger."

During the first segment, the prosecutor referenced an admitted photograph of Esparza lying on the ground after the shooting and said: "Jesus Esparza can't be here to testify about what happened. But his body is crying out evidence to you based on [a police officer's] ability to take this photograph." Later, during rebuttal, the other prosecutor said: "There's no sympathy that day when [Jones] pulled th[e] trigger[] three times. There's no sympathy there. But you can't, and you're legally obligated not to[,] allow that to influence you."

During rebuttal, the second prosecutor also said: "[B]efore you get all the way to this lesser excuse kind of homicide, voluntary

manslaughter, . . . you have to all agree that there's no premeditation."

The jury convicted Jones on all four counts. For each of the two first-degree murder charges, Jones received a hard 25 life sentence.

This appeal follows. Jones' first argument is that he should have been immune from prosecution under K.S.A. 21-3219(a). His second, alternative argument is that he is entitled to a new trial because of three incidents of prosecutorial misconduct during closing argument. We address each of Jones' arguments below; and we affirm the judgment of the district court.

### IMMUNITY FROM PROSECUTION

Jones concedes that he "did not specifically move for relief pursuant to K.S.A. 21-3219(a)" but asserts that "he did clearly raise self-defense as justification in this case, . . . which in turn invokes the immunity provisions of [the statute]."

The State responds by arguing that Jones cannot seek immunity from prosecution under K.S.A. 21-3219 for the first time on appeal. It also argues that Jones' briefing of the issue was inadequate and should lead this court to treat it as abandoned on appeal.

We address the State's last point first because it raises a threshold question. If Jones abandoned this issue on appeal, we need proceed no further in our analysis. See *State v. Holmes*, 278 Kan. 603, 622, 102 P.3d 406 (2004) (appellant abandons issue on appeal by not adequately briefing issue). Our review of Jones' brief persuades us that he did not abandon the immunity issue. Both sides principally rely on the only directly applicable authority—the language of the statute itself. Because the necessary timing of an immunity assertion under K.S.A. 21-3219 raises a question of first impression, it is not surprising that on-point secondary legal authority for the parties' positions is nonexistent and thus uncited in their briefs. Parties in the position of those in this case are free (and encouraged) to direct us to potentially persuasive law from other jurisdictions, but their failure to do so is not fatal to consideration of their appellate arguments.

The next preliminary point is identification of our standard of review. Because the district court judge was never called upon to

rule on the question before us, strictly speaking, the phrase "standard of review" is a misnomer. There is no decision before us to review. But we note that, had the district judge been given an opportunity to weigh in, our review of that decision on such a question of law would have been plenary. See *State v. Haberlein*, 296 Kan. 195, 203, 290 P.3d 640 (2012) (review of question on whether appellate issue preserved unlimited). Likewise, interpretation and construction of statutes raises questions of law subject to unlimited appellate review. See *State v. Bruce*, 295 Kan. 1036, 1038, 287 P.3d 919 (2012) (interpretation of statute subject to de novo review). We thus have no hesitation in applying the same standard of review in this case.

K.S.A. 21-3219 provides:

"(a) A person who uses force which, subject to the provisions of K.S.A. 21-3214, and amendments thereto, is justified pursuant to K.S.A. 21-3211, 21-3212 or 21-3213, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A county or district attorney or other prosecutor may commence a criminal prosecution upon a determination of probable cause."

Only two prior cases before this court have addressed immunity under K.S.A. 21-3219.

In the first, *McCracken v. Kohl*, 286 Kan. 1114, 1118, 191 P.3d 313 (2008), this court explained that "a prerequisite to immunity [under K.S.A. 21-3219] is that the use of force be justified by K.S.A. 21-3211 [defense of person], K.S.A. 21-3212 [defense of dwelling], or K.S.A. 21-3213 [defense of property other than a dwelling]." K.S.A. 21-3211 obviously is the prerequisite that Jones would have had the district court apply in this case. But, other than laying this

floor under our analysis, *McCracken* is otherwise unhelpful on to-day's question.

In our second case, *State v. Ultreras*, 296 Kan. 828, 295 P.3d 1020 (2013), defendant Manuel Ultreras appealed his conviction of three counts of aggravated battery. The charges stemmed from an altercation in which Ultreras, working security at a bar, hit three other men with a metal baton. Before trial, Ultreras filed a motion to dismiss, claiming immunity from criminal prosecution under K.S.A. 21-3219. The district court held a hearing on the motion, and, after considering arguments from the parties, determined that Ultreras had the burden to prove by a preponderance of the evidence that his use of force was necessary in order to qualify for immunity under the statute. This court disagreed. We held that the standard of proof for whether a defendant is entitled to immunity from criminal prosecution pursuant to K.S.A. 21-3219 is probable cause, and the State bears the burden of establishing that force was not justified as part of the probable cause determination. 296 Kan. at 845.

Under *Ultreras*, had Jones filed a pretrial motion to dismiss based on a claim of immunity under K.S.A. 21-3219, it is clear that the State would have borne the burden of establishing that force was not justified as part of the probable cause determination required under K.S.A. 21-3219(b) and (c). See *Ultreras*, 296 Kan. 828, Syl. ¶¶ 1, 2; *McCracken*, 286 Kan. at 1118. But Jones filed no such motion. *Ultreras* does not answer whether he could assert immunity under K.S.A. 21-3219 for the first time on direct appeal of his conviction.

The language of K.S.A. 21-3219 also does not clearly answer the question before us. See *Ultreras*, 296 Kan. at 842 (statute provides little guidance on procedure for application); see also *State v. Marks*, 297 Kan. 131, 145, 298 P.3d 1102 (2013) (plain language of statute provides starting point for statutory interpretation). Jones argues that this appeal is a continuation of his "criminal prosecution," as that phrase is defined in K.S.A. 21-3219(a)—" '[C]riminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant"—and thus he can be held to be immune from it, as well as the law enforcement and district court

proceedings that led to it. We disagree. The statutory definition of "criminal prosecution" to include a "prosecution" tells us nothing. And this appeal, as was pointed out during oral argument, was initiated by Jones, not by the State. The State's "prosecution" of Jones ended with his sentencing.

Jones also argues that claiming self-defense was enough to invoke K.S.A. 21-3219 immunity. This self-executing method of invocation certainly is not laid out in the statute. Jones may attempt to divine it from this court's third syllabus paragraph in *McCracken*, which states: "To establish that a use of force is a justifiable defense, so as to invoke the immunity of K.S.A. 21-3219, the party claiming immunity must pass both a subjective and an objective test." 286 Kan. 1114, Syl. ¶ 3. But this syllabus phrase cannot be stretched to Jones' purposes here. It gave content to the prerequisites for claiming K.S.A. 21-3219 immunity; it did not dictate procedure or the lack of it.

Jones also attempts to draw an analogy to qualified immunity for government officials. But, to the extent such a comparison is sound, an issue we do not decide today, qualified immunity is waived if it is not raised early in a case as an affirmative defense. See *Bentley v. Cleveland County Bd. of County Com'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994) (citing, *e.g.*, *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 [6th Cir. 1986] [" '[I]mmunity, whether qualified or absolute, is an affirmative defense which must be affirmatively pleaded . . . .' "], *cert. denied* 479 U.S. 1103 [1987]). As we recognized in *McCormick v. Board of Shawnee County Comm'rs*, 272 Kan. 627, 35 P.3d 815 (2001):

" 'Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." [Citation omitted.] The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." [Citation omitted.] As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." [Citation omitted.]' " 272 Kan. at 637 (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 [2001]).

Jones also makes a legislative purpose argument. See *State v. King*, 297 Kan. 955, 305 P.3d 641, 655 (2013) (when statutory

language ambiguous, court may consider background considerations that speak to legislative purpose and employ canons of statutory construction). Before enactment of K.S.A. 21-3219 in 2006, he argues, criminal defendants could already assert self-defense. Thus the legislature enacted K.S.A. 21-3219 to provide *additional* protection. K.S.A. 21-3219 "must be construed to allow persons to use force in self-defense without fear of prosecution and conviction . . . ." Jones' assertion is consistent with the general purpose of recognized immunities. See *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991); *Ultreras*, 296 Kan. at 840 (" 'This aspect of the new law is meant to provide not merely a defense against liability, but protection against the burdens of prosecution and trial as well.' ") (quoting *Rodgers v. Com.*, 285 S.W.3d 740, 753 [Ky. 2009]).

But, in *Ultreras*, we identified the additional protection that the statute afforded an accused:

"Generally, a detached Kansas magistrate considering whether to issue a warrant or summons merely determines 'that there is probable cause to believe both that a crime has been committed and that the defendant has committed it.' K.S.A. 22-2302(1). Under K.S.A. 21-3219, however, once a defendant raises justified use-of-force immunity before a court, a probable cause determination must also include a determination that the defendant's use of force was not justified under K.S.A. 21-3211, K.S.A. 21-3212, or K.S.A. 21-3213. Hence, the statute as written with a probable cause standard adds an additional requirement and is meaningful." *Ultreras*, 296 Kan. at 844.

And this additional protection can be realized only if immunity under K.S.A. 21-3219 is asserted as early as possible prior to trial. In other words, to the extent that Jones urges us to look at the purpose of the statute to construe the procedure to be followed, his argument that immunity can be raised for the first time on appeal is self-defeating. If the purpose of the statute is to protect individuals from the burdens of prosecution and conviction, that purpose cannot be effected when immunity is raised for the first time on appeal. By that time, prosecution and conviction have occurred. The burdens they impose cannot be lifted.

We also note that, although the question of whether K.S.A. 21-3219 immunity may be invoked for the first time on appeal is one

of law, the determination to be made on the existence of probable cause under subsections (b) and (c) once the statute has been invoked necessitates a factual inquiry and determination. District courts are the places to hold evidentiary hearings. Appellate courts are not. Indeed, Jones' case, with its many alcohol-imbibing witnesses and their conflicting stories, is an excellent example of a situation in which all of the factual examination and credibility weighing abilities and expertise of district courts would be well used.

The State directs the court's attention to K.S.A. 22-3208(4), which provides that "consent to trial upon a complaint, information or indictment shall constitute a waiver of defenses and objections based upon the institution of the prosecution . . . ." The only sensible reading of K.S.A. 21-3219 is that it creates an affirmative defense to which K.S.A. 22-3208(4) applies.

Thus, on the only question before us today, we hold: If a defendant believes he or she is entitled to Stand-Your-Ground immunity under K.S.A. 21-3219, then the defense must be asserted before trial opens or a dispositive plea is entered. Such an assertion is a timely trigger of the State's probable cause burden. A defendant who waits to invoke K.S.A. 21-3219 immunity until appeal after conviction simply waits too long. By that time, the facts and the defendant's guilt beyond a reasonable doubt have been established. In Jones' situation in particular, the jury rejected his claim of self-defense. This means the State has already borne an evidentiary burden far higher than the probable cause burden imposed upon it by the Stand-Your-Ground statute.

## PROSECUTORIAL MISCONDUCT

Jones' alternative argument on appeal is that the prosecutorial team committed reversible misconduct by implying that premeditation can occur instantaneously, by appealing to the passions of the jury, and by misstating the law on how the jury could reach a guilty verdict.

Our standards governing review of prosecutorial misconduct claims have often been recited:

"Review of prosecutorial misconduct claims involves a two-step process. The appellate court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial."

"The case of *State v. Tosh*, 278 Kan. 83, 93, 97, 91 P.3d 1204 (2004), identified three factors to consider in determining if the prosecutorial misconduct so prejudiced the jury against the defendant that a new trial should be granted: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. Under *Tosh*, none of these three factors is individually controlling. And before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), have been met." *State v. Bridges*, 297 Kan. 989, Syl. ¶¶ 14, 15, 306 P.3d 244 (2013).

We have also recently reviewed the two harmlessness tests and how they intersect in a prosecutorial misconduct analysis. Under the constitutional harmless error analysis defined in *Chapman*,

" 'the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

"Under the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. The court 'determine[s] if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record.' [Citation omitted.]

"Under both standards, the party benefiting from the error . . . bears the burden of demonstrating harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is higher when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110 ('Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.')." *Bridges*, 306 P.3d at 260.

In addition, when

"both the constitutional and nonconstitutional error clearly arise from the very same acts and omissions, we logically begin with our harmlessness analysis of the constitutional error. . . . [I]f we decide the constitutional error is not harmless and reverse the convictions, there is no point in analyzing whether the State met the

lower standard for harmlessness under K.S.A. 60-261." *Bridges*, 306 P.3d at 262 (citing *Herbel*, 296 Kan. at 1111).

*Premeditation*

Jones' first claim of prosecutorial misconduct is that the State improperly implied that premeditation can be instantaneous. This court has repeatedly found reversible error in such cases. See *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011); see also *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004) (prosecutor committed reversible misconduct when she pantomimed firing of gun, said: "One squeeze of a trigger is all it takes."); *State v. Holmes*, 272 Kan. 491, 497-500, 33 P.3d 856 (2001) (prosecutor committed reversible misconduct: "Ladies and gentlemen, premeditation can occur in an instant. That's the law in the State of Kansas."). Premeditation is more accurately described as a " ' "state of mind" ' that relates 'to a person's reasons and motives for acting as he or she did.' " *Hall*, 292 Kan. at 850 (quoting *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 [2002]).

" ' " 'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.' " *State v. Martis*, 277 Kan. 267, 301, 83 P.3d 1216 (2004) (quoting *State v. Hebert*, 277 Kan. 61, 88, 82 P.3d 470 [2004]). Several factors may give rise to an inference of premeditation, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *State v. Scott*, 271 Kan. 103, 109, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). Moreover, premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one. *State v. Scott*, 271 Kan. at 108; see also *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005).' *State v. Morton*, 283 Kan. 464, 474-75, 153 P.3d 532 (2007)." *Haberlein*, 296 Kan. at 205.

Jones contends that the prosecutors' references to his "five-pound pressure on [the] trigger" and to Jones raising his arm and pulling the trigger effectively reduced the time necessary for premeditation to the time in which it takes to pull the trigger. Although

neither prosecutor used the word "instantly," Jones believes the message conveyed was the same.

The State argues that the facts of this case are distinguishable from our earlier cases in which we held there was reversible prosecutorial misconduct, because neither prosecutor stated outright or gestured unmistakably to communicate that premeditation can occur in an instant. In its view, the references to the trigger being pulled, when viewed in context, were not error.

In this case, we agree with the State.

The first prosecutor started off his premeditation discussion by stating three times that premeditation required Jones to have thought the matter over before the killing. The prosecutor then identified key factual intervals at which Jones may have had the opportunity to do so. The prosecutor posed a rhetorical question: "At what point did the defendant think this over in his mind?" Jones' placement of a "five-pound pressure on that trigger" marked the end of the prosecutor's string of factual intervals. In context, it is clear to us that the first prosecutor argued only that Jones had plenty of opportunity to premeditate the killings well before firing the gun at the victims.

The second prosecutor's comment on premeditation also did not diminish it. Informing the jury that the time it takes to think over a plan "depends" and then outlining three crucial facts is not misconduct. See *Hebert*, 277 Kan. at 86-87 (premeditation " 'merely requires a decision to act, and in this case, a decision to pull the trigger' " not outside considerable latitude given prosecutor, considering prosecutor's entire argument). Moreover, the second prosecutor explicitly stated at the outset of her rebuttal that premeditation "has to be something more than an instantaneous act."

Because we see no error in the two prosecutors' statements about premeditation, we need not consider harmlessness at this point.

## Passions of the Jury

Jones' second line of attack on the State's closing argument asserts that the State's two prosecutors inflamed the passion of the jury and improperly invoked sympathy for the victims.

A jury must decide a case on evidence and controlling law, and not on sympathy, emotion, or prejudice. See *State v. Brown*, 295 Kan. 181, 212-13, 284 P.3d 977 (2012); *State v. Minski*, 252 Kan. 806, 813-14, 850 P.2d 809 (1993) (citing *Com. v. Marshall*, 523 Pa. 556, 568 A.2d 590 [1989]). Thus a prosecutor has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury. *State v. Scott*, 286 Kan. 54, 77, 183 P.3d 801 (2008). "[A] prosecutor must guard against appeals to jurors' sympathies or prejudices." *Hall*, 292 Kan. at 853; see *State v. Friday*, 297 Kan. 1023, Syl. ¶ 5, 306 P.3d 265 (2013) (prosecutor may comment on admitted evidence as long as the remarks accurately reflect evidence; accurately state law; do not inflame passions, prejudices of jury; do not divert jury from its duty to decide case on fact, law).

Jones challenges the first prosecutor's statement that Esparza's body was "crying out evidence." This comment was isolated and did not rely on facts not in evidence. See *State v. Hernandez*, 292 Kan. 598, 604, 257 P.3d 767 (2011) (prosecutor's comment about involvement in investigation of case improper, harmless). The prosecutor was making a point about the position of Esparza's body, which showed that he was standing when he was shot and that he was shot from behind. This was well within the wide latitude granted a prosecutor in discussing the evidence.

Read in context, the second prosecutor's statement about sympathy also does not trouble us. The prosecutor told jurors they were required "to eliminate . . . feelings of sympathy of someone who sits before you and maybe they look young to you. Or maybe they have been looking at you the whole time and you just—you want to be sympathetic." This appears to have been addressed to any sympathy the jurors might feel for Jones. The prosecutor was correctly reminding the jurors of their duty to base their decision on the evidence rather than emotion. This was not improper commentary. See *State v. Williams*, 42 Kan. App. 2d 725, 727-28, 216 P.3d 707 (2009), *rev. denied* 290 Kan. 1104 (2010) (not "inherently pernicious to tell jurors not to do things they should not do" in context of no-sympathy jury instruction). We do note, however, that the Pattern Instructions for Kansas no longer suggest inclusion

of a no-sympathy instruction in the usual criminal case. See *State v. Aguero-Hernandez*, No. 106,079, 2012 WL 2149793, at *5 (Kan. App. 2012) (unpublished opinion), *rev. denied* 296 Kan. 1131 (2013). This may counsel caution for the State in this type of argument.

*Misstatement of Law*

Jones' final argument on prosecutorial misconduct focuses on the way the second prosecutor explained how the jury could reach a guilty verdict. Specifically, the prosecutor said: "[B]efore you get all the way to this lesser excuse kind of homicide, voluntary manslaughter, . . . you have to all agree that there's no premeditation." Jones claims that the prosecutor incorrectly told jurors they had to reach a unanimous acquittal on first-degree murder before considering voluntary manslaughter and thus misstated the law.

Jones is correct. See *State v. Scott-Herring*, 284 Kan. 172, 178-79, 159 P.3d 1028 (2007); *State v. Hurt*, 278 Kan. 676, 682, 101 P.3d 1249 (2004) (improper for prosecutor to state unanimous acquittal required before considering lesser included offenses). The second phrase of the prosecutor's statement should have been "at least one of you must believe there is no premeditation" or an equivalent, see *Hurt*, 278 Kan. at 682, rather than "you have to all agree that there's no premeditation." The prosecutor communicated exactly the opposite, telling the jurors that each had to reject premeditation before a lesser included offense could be considered. This was error. Unanimity is required for conviction but not for acquittal.

Because of this error, we must examine harmlessness, and we do so first under the constitutional standard. See *Bridges*, 306 P.3d at 262. Jones argues, per *Tosh*, that the prosecutor's misconduct was gross and flagrant and the product of ill will.

"In determining whether prosecutorial misconduct was gross and flagrant, among the things an appellate court considers are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules."

"In determining whether prosecutorial misconduct was motivated by ill will, among the things an appellate court considers are whether the conduct was de-

liberate, repeated, or in apparent indifference to a court's ruling." *Bridges*, 306 P.3d 244, Syl. ¶¶ 18, 19.

Before making her incorrect statement of law about the jury's process, the second prosecutor correctly stated: "[I]f you cannot agree [on the existence of premeditation], only then do you go to second and determine whether or not the State has proven second-degree murder." See *Hurt*, 278 Kan. at 682 (quoting *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 [1982]) (words " 'if you cannot agree,' " when used to preface instruction on lesser charge, do not require unanimous acquittal of greater charge). "Where a prosecutor makes both a misstatement of the law and a correct recitation of the applicable law in a closing argument, we have been loath[] to characterize the misstatement as being gross and flagrant misconduct. [Citations omitted.] Neither does such a situation support a finding of ill will." *State v. Naputi*, 293 Kan. 55, 62, 260 P.3d 86 (2011). We remain loath to characterize the prosecutor's error here as either gross and flagrant or the product of ill will.

Our constitutional harmlessness analysis next turns to the State's argument that there is no reasonable possibility the misstatement of law contributed to the outcome of the trial. See *Ward*, 292 Kan. 541, Syl. ¶ 6. As the State points out, the evidence against Jones was substantial. Two witnesses testified that Jones rushed past them, and moments later they heard gunshots. Nash testified that he saw Jones suddenly appear and shoot both victims in the back of the head. The coroner testified that both victims died from gunshot wounds to the back of the head. Jones fled after the shooting, suggesting a culpable mental state rather than a subjective belief that the shooting was necessary to defend himself, undercutting his theory of the case. We hold, under the *Chapman* standard for harmless constitutional error, the State has met its burden of proving "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, . . . there is no reasonable possibility that the error contributed to the verdict." See *Ward*, 292 Kan. 541, Syl. ¶ 6. Given this holding, we need not determine whether the State has also met its burden of showing harmless error under the lower threshold artic-

ulated in K.S.A. 60-261. See *State v. Ochs*, 297 Kan. 1094, 306 P.3d 294, 302 (2013) (citing *Herbel*, 296 Kan. at 1110-11).

### Conclusion

Immunity under K.S.A. 21-3219 cannot be invoked for the first time on appeal after conviction. Further, in this case, one prosecutor's single misstatement of law during the rebuttal portion of closing argument, although error, was harmless. It did not deprive defendant Austin N. Jones of a fair trial.

The judgment of the district court is affirmed.