NOT DESIGNATED FOR PUBLICATION

No. 114,918

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JESUS CARRASCO,
*Appellee*.

MEMORANDUM OPINION

Appeal from Seward District Court; CLINT B. PETERSON, judge. Opinion filed September 30, 2016. Reversed and remanded with directions.

*Ehren Penix*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellant.

No appearance for appellee.

Before PIERRON, P.J., GREEN and BUSER, JJ.

*Per Curiam*:  The State charged Jesus Carrasco with attempted first-degree murder, conspiracy to commit first-degree murder, criminal discharge of a firearm, criminal possession of a firearm, and criminal damage to property. A magistrate judge held a preliminary hearing for Carrasco and his three codefendants, and bound all four codefendants over for trial. Carrasco filed a motion to dismiss with the district court, and the court granted his motion. The State appeals the court's order, arguing there was sufficient evidence to establish probable cause; the court erred in using de novo review in ruling on the motion; and the court erred in raising the issue of evidentiary errors at the preliminary hearing *sua sponte*. We reverse and remand with directions.

1

On the night of March 28, 2015, James and Jessica Harp were driving in their truck on Cornell Street in Liberal. Another truck crashed into the front of their truck and several gunshots were fired at them. The couple was able to drive away and immediately called the police.

The State eventually charged Carrasco with two counts of attempted first-degree murder, one count of conspiracy to commit first-degree murder, one count of criminal discharge of a firearm, one count of criminal possession of a firearm, and one count of criminal damage to property in connection with the incident. The State also charged codefendants Guadalupe Perez, Mario Sanchez, and Daniel Rios.

At the preliminary hearing before the magistrate judge, the State presented evidence that the Harps had positively identified Carrasco's truck as the truck used in the shooting. Police testified they were able to match some of the damage on Carrasco's truck to some of the damage on the Harps' truck. Jessica testified she saw Carrasco at the scene of the shooting.

The State's theory at the preliminary hearing was that Carrasco, Sanchez, Perez, and Rios—members of a gang known as Sur 13 or South Siders—had intended to kill Mauricio Neal. Neal is in a gang known as the Folks gang. The State presented evidence that Neal lived on Cornell Street, at approximately the spot where the shooting occurred. It also presented testimony that Neal had been involved in an altercation with the mother of Carrasco's child earlier that evening. Carrasco, Sanchez, and Perez had been at a cookout at the time. After hearing about the incident with Neal, all three left in Carrasco's truck shortly before the shooting.

Jessica Vasquez testified that later in the evening Carrasco commented he had a "big ass dent" in his truck. She also stated Sanchez had a "long gun" which he brought

2

back to the cookout. The State presented evidence that Sanchez had taken steps to conceal the long gun and perhaps another gun that evening.

At the end of the hearing, the magistrate judge bound all four codefendants over for trial. Carrasco filed a motion to dismiss for lack of probable cause following the preliminary hearing. He specifically argued the State's witnesses had provided inconsistent testimony. The district court granted the motion. According to the court, it was unable to find probable cause due to numerous evidentiary errors and "the difficulty the Court had in keeping straight who did what, with whom, and when." The State appeals.

To bind a defendant over at a preliminary hearing, the district court must find the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt. *State v. Brown*, 299 Kan. 1021, 1030, 327 P.3d 1002 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. ___, 375 P.3d 332 (2016). On appeal from the granting or denial of a motion to dismiss filed after the preliminary hearing, an appellate court reviews the district court's probable cause finding de novo. *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012) (denial of motion to dismiss).

In reviewing the evidence in a case like this, the appellate court draws inferences in favor of the State. Moreover, the evidence need only show probable cause, not guilt beyond a reasonable doubt. Even if the evidence is weak, the defendant should be bound over for trial if the evidence tends to establish that the offense was committed and that the defendant committed it. *Washington*, 293 Kan. at 733-34.

At the preliminary hearing, the State presented the testimony of seven witnesses. The evidence presented was sufficient to establish probable cause that Carrasco

3

committed attempted first-degree murder. Evidence on the conspiracy charge was not as strong, but it was still sufficient to support a probable cause finding.

James Harp testified that on the night of March 28, 2015, at approximately 11:30 p.m., he was driving Jessica home from the bowling alley in his black 2013 Chevy Silverado. He was on Cornell Street, where his nephew lives, when Jessica said, "We need to get out of here." He started to speed up and saw headlights in his rearview mirror that were less than 100 yards away and approaching quickly. The headlights belonged to a truck, and as it came up beside him, it hit the front quarter panel of his truck on the driver's side. The collision brought his truck to a stop. The occupants of the other truck began shooting at James' truck. He heard at least four or five shots, but he did not see who fired them. Based on his experience with guns, James testified he thought one of the guns was a pistol based on the sound it made, while the other gun was "a little muffled."

James testified that as soon as he heard gunfire, he "floored it" and pushed past the other truck. After driving off, Jessica called 911, and they met up with the police. James described the suspect vehicle as an older Chevy Silverado pickup truck with a silver extended cab or crew cab. The next morning, the police showed him a photo of a vehicle, and he identified it as the one used in the shooting.

James testified he had driven past the scene of the shooting frequently since it had happened. He stated he had seen a truck almost exactly like his in the area. He speculated the incident was a result of "mistaken identity," and the shooters were looking for someone with a truck very similar to his.

Jessica Harp testified that as she and James drove down Cornell Street, she saw a truck parked in front of her nephew's house, on the right hand side of the street. Two men were in the bed of the truck, and one man was outside of the truck, standing on the sidewalk. She identified all three men as Hispanic.

4

Jessica testified that the man outside of the truck was wearing a blue bandanna around his face and he looked directly at her as they drove by at about 10 to 15 miles per hour. She thought the men were probably up to no good because one of them had a bandanna on his face, so she told James they needed to get out of there.

Jessica later identified Carrasco as the man in the blue bandanna. She explained she was able to identify him just by his eyes, saying "he just looked at me, it bore into me. . . . [H]is eyebrows were distinctive. And the slant, the shape of his eyes." She never looked at a line up to make an identification. Instead, she had seen Carrasco's picture on the Liberal Police Department's public Facebook page. She also identified Carrasco in court.

Similar to James, Jessica testified that as they approached the intersection of Harrison Circle Park and Cornell Street, a truck hit them and gunshots were fired. She heard four shots, and saw three bullet holes in the windshield. James drove off and she called 911. She reported they had just been shot at by three Hispanic males in a silver or white Chevy Silverado.

Anthony Owens testified that he is the Harps' nephew and he lives on Cornell Street. He was out driving on the night of the incident. The police originally thought he was involved in the shooting because he drives a four-door Silverado.

Owens testified that Mauricio Neal lives across the street from him. When questioned by police on the night of the incident, he said the shooters may have been there for Neal. He told police he had seen an altercation at Neal's house, and he had seen a truck matching the description of the suspect's truck at Neal's house one time. He also testified, however, that Neal had an older Ford Bronco that did not appear to run.

Ramon Acosta testified he is one of Neal's neighbors. Officer Jared Ratzlaff questioned him after the incident, but he did not tell the officer anything. Acosta testified there had been some problems in his neighborhood, and he had broken up some fights. These fights sometimes involved people from outside the neighborhood. They also sometimes involved Hispanic males, but he did not tell Officer Ratzlaff this. He did tell Officer Ratzlaff he had seen a silver or tan Chevy Silverado pickup outside Neal's house.

Officer Ratzlaff testified he responded to the scene of the shooting. Acosta told him a group of South Siders had been at Neal's house a few days before causing problems. Officer Ratzlaff remembered that Carrasco was a South Sider, and he had a truck that matched the description of the suspect's truck. He went to Carrasco's house to investigate the truck.

Once there, Officer Ratzlaff saw Carrasco's truck in the driveway. He described the truck as gray or silver-colored. The truck had damage to the front quarter panel of the passenger side, which was consistent with what he had been told to look for. He testified that the damage appeared fresh because the truck was covered in dirt but the damaged area was clean.

Officer Ratzlaff testified he took pictures of the truck to show to the Harps for identification purposes. He also took measurements of the damage to Carrasco's truck as well as the size of the tires. He did not try to match the measurements of the damage to the Harps' truck, but he did match the measurements of the tires to tire marks left at the scene.

Officer Ratzlaff returned to Carrasco's house. Carrasco consented to a search of his house. During the search, Officer Ratzlaff found a blue bandanna in what he was told was Carrasco's bedroom.

Officer Dwayne Devellen testified he arranged to have Carrasco's truck towed to the police impoundment lot. As he was waiting for the tow truck, he found a small piece of black plastic tucked into the front passenger wheel of Carrasco's truck. Once the truck was in police impound, he found another piece of black plastic on the passenger side of the truck. Officer Devellen compared the two pieces of plastic he took off of Carrasco's truck to the Harps' truck. The pieces appeared to match two scratches on the Harps' truck. Officer Devellen testified that through his investigation he learned that Sanchez had been with Jessica Vasquez on the night of March 28, so he and Detective Jason Ott questioned Vasquez about the incident.

Vasquez testified that on the day of the shooting, she began drinking at 2 p.m. At approximately 6 p.m., she was in Carrasco's truck, and she saw a handgun in the glove compartment. She was also intoxicated at the time.

Later that night, Vasquez went to a cookout. Carrasco, Sanchez, Rios, and Perez were there. Also at the cookout were Jessica Ortega, who had a child with Carrasco, and Crystal Mendez. At some point, Ortega and Mendez left the party in Carrasco's truck to change clothes. According to Vasquez, they returned 10 minutes later looking scared. Ortega said the Folks gang were attacking Carrasco's truck. They also mentioned that a man named Chito was involved in the attack. Chito is Neal's nickname.

Vasquez originally told police that immediately after Ortega and Mendes returned to the cookout, at 11 p.m., Carrasco, Sanchez, Rios, and Perez got in Carrasco's truck, saying they were going to look for the Folks gang. The four returned 20 minutes later saying they had not found them. On the stand, Vasquez did not remember giving this information to police.

Vasquez testified that Sanchez, Rios, and Carrasco got in Carrasco's truck and left the cookout at 11 p.m. and was the only time they left. She knows they left at 11 p.m.

7

because she happened to check the time on her phone. She also testified, however, that she was drunk at the time, and she had been smoking marijuana that day.

Later, Eloy Chico came to the cookout, but Vasquez does not remember what time he showed up. She and Ortega went with Chico in his car to Carrasco's mother's house to pick up Carrasco, Sanchez, and Rios. Vasquez saw Rios hand Sanchez what she described as a "long gun," one that was different from the gun Carrasco had in his truck earlier. They all got into Chico's car with the gun and went back to the cookout.

Vasquez testified there was no conversation on the way back to the cookout. She did tell one of the detectives that Carrasco said he had a "big ass dent" in his truck. She also told the detective that Sanchez said he was the one who "blasted them." She later testified she remembered Carrasco saying he had a big ass dent in his truck, but she did not remember Sanchez saying anything.

Vasquez stayed at the cookout until 3 a.m. Then, she, Sanchez, and another woman went to Vanessa Barray's house. On the way, Sanchez had something in his lap wrapped in a sweatshirt. Later in her testimony, Vasquez claimed it was the long gun in the sweatshirt. She could not remember how big it was, other than to say it was bigger than a bowling ball. At Barray's house, she asked Sanchez what he had done that night and he said, "Don't worry about it." She also asked him what he did with the gun and he said he got rid of it.

Vasquez testified that the next day, Barray called her. Barray told her to tell police she was Sanchez' girlfriend to help provide him with an alibi. Vasquez originally told police she was Sanchez' girlfriend, but she recanted because it was not true.

Vasquez testified the officers who interviewed her told her she could be charged in the case. She agreed to cooperate so she would not be charged. She also did not want to

risk having her 3-year-old child taken away. She denied having any agreement with the officers, however, and none of the conversations were recorded.

The evidence presented at the preliminary hearing is sufficient to support a finding of probable cause that Carrasco committed attempted first-degree murder. First-degree murder is the intentional and premeditated killing of a human being. K.S.A. 2015 Supp. 21-5402(a). In Kansas, premeditation is defined as "to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." *State v. Jones*, 298 Kan. 324, 336, 311 P.3d 1125 (2013). Courts may draw an inference of premeditation from several factors, including: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *Jones*, 298 Kan. at 336. A court may reasonably infer premeditation and deliberation from the established circumstances of a crime. 298 Kan. at 336.

Because the State charged Carrasco with attempted first-degree murder, Carrasco does not need to actually have succeeded in killing anyone. Under K.S.A. 2015 Supp. 21-5301(a), "[a]n attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." Thus, to demonstrate probable cause that Carrasco committed attempted first-degree murder, the State only needed to show Carrasco made an intentional overt act toward the killing of a human being.

The evidence demonstrates that Carrasco left the cookout after hearing that Neal had been harassing Ortega and Mendez. Carrasco then waited outside Neal's home with at least two other males until he believed his intended target had arrived. He covered his face with a bandanna, presumably to conceal his identity. Then, Carrasco and those with him shot at the Harps using a pistol and possibly one other gun. From this evidence, one

could reasonably infer that Carrasco formed a design to kill Neal, and then carried out an overt act towards this goal.

The State specifically argues that Carrasco is guilty of attempted first-degree murder under the theories of transferred intent and aiding and abetting. Under a theory of transferred intent, a defendant is still criminally responsible for a homicidal act against someone other than the intended victim because "'[i]t is generally held that such a homicide partakes of the quality of original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the assault followed upon the intended victim instead of another.'" *State v. Jones*, 257 Kan. 856, 859, 896 P.2d 1077 (1995) (quoting *State v. Moffitt*, 199 Kan. 514, 535, 431 P.2d 879 [1967], *overruled on other grounds by State v. Underwood*, 228 Kan. 294, 615 P.2d 153 [1980]).

In this case, the evidence suggests the intended target of the shooting was Neal. Officer Ratzlaff testified that Acosta told him some members of Carrasco's gang had been at Neal's house a few days before causing problems. Owens testified he had seen an altercation at Neal's house a few days before. Both Owens and Acosta testified they had seen a vehicle similar to Carrasco's truck outside Neal's house before. Vasquez testified that Ortega and Mendez reported Neal had been harassing them shortly before Carrasco left the cookout. The Harps testified they saw a truck similar to Carrasco's parked outside Neal's home immediately before the shooting. This evidence establishes Neal was the intended target, but that intent was transferred to the Harps.

There is no direct evidence that Carrasco himself fired any of the shots or drove the vehicle. The State argues, however, that Carrasco is guilty under a theory of aiding and abetting. Under the aiding and abetting statute, "[a] person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting

10

the crime." K.S.A. 2015 Supp. 21-5210(a). Despite having its own statute, aiding and abetting is not a separate crime; it merely extends criminal liability to a person other than the principal actor. *State v. Robinson*, 293 Kan. 1002, 1038, 270 P.3d 1183 (2012). "'[T]o establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate that [the defendant] was facilitating the success of the venture.'" 293 Kan. at 1038. Here, Jessica Harp testified she saw Carrasco at the scene of the shooting. More importantly, the evidence supports a finding that Carrasco's truck was used to carry out the shooting. Carrasco's presence at the shooting and the use of his truck suggest he not only knowingly associated with the act but facilitated its execution with the use of his truck.

Conspiracy consists of two elements: "'(1) an agreement between two or more persons to commit or to assist in committing a crime and (2) an overt act in furtherance of the conspiracy committed by one or more of the conspirators.'" *State v. Moody*, 35 Kan. App. 2d 547, 555, 132 P.3d 985 (2006); see also K.S.A. 2015 Supp. 21-5302(a). Evidence of a formal agreement is not necessary to establish a conspiracy. A tacit agreement regarding the unlawful purpose among the parties is sufficient. *State v. Hernandez*, 24 Kan. App. 2d 285, 291, 944 P.2d 188, *rev. denied* 263 Kan. 888 (1997). Furthermore, "'the existence of the agreement does not need to be proved directly but may be inferred from other facts proved.' [Citation omitted.]" *Hernandez*, 24 Kan. App. 2d at 291.

In this case, evidence of a conspiracy was slim. Vasquez testified she saw Carrasco, Sanchez, and Rios leave the cookout in Carrasco's truck after Ortega had complained about Neal harassing her. They left at 11 p.m. according to her testimony, which was approximately 30 minutes before the shooting. Later that evening, Vasquez picked up the three men, and Sanchez had a gun. Jessica testified she saw two Hispanic males with Carrasco at the scene of the shooting. Even though this evidence is weak, it

11

does tend to establish that Carrasco had a tacit agreement with Sanchez and Rios, and at least Carrasco carried out an overt act in furtherance of the agreement's unlawful purpose.

Additionally, the State attempted to gain admission of hearsay statements from Sanchez in further support of the conspiracy charge. Known as the coconspirator hearsay exception, hearsay evidence is admissible where the statement was made while "the [defendant] and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination." K.S.A. 2015 Supp. 60-460(i)(2).There are four requirements for the coconspirator hearsay exception:

> "(1) [T]he person testifying must be a third party; (2) the out-of-court statement . . . must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been made while the conspiracy was in progress; and (4) the statement must be relevant to the plan or its subject matter." *State v. Betancourt*, 301 Kan. 282, 298, 342 P.3d 916 (2015).

Sanchez made several statements which are admissible under this exception. Vasquez testified Sanchez told her he had gotten rid of the gun, and told her to lie to provide him an alibi. While Sanchez made these statements after the shooting, statements made during an attempt to conceal a crime are admissible under the coconspirator hearsay exception. *Moody*, 35 Kan. App. 2d at 562 (finding third-party statement that someone told him defendant fled scene of crime was admissible under coconspirator exception). Furthermore, because the conspiracy continued until the next day, Sanchez' statement in the car that he "blasted them" is also admissible against Carrasco. See *Betancourt*, 301 Kan. at 929-30 (finding coconspirators statement "I got him, I got him" made after shooting admissible under coconspirator exception). The other circumstantial evidence, along with Sanchez' statements, are sufficient to support a finding of probable cause that Carrasco was involved in a conspiracy to commit first-degree murder.

12

In his motion to dismiss, Carrasco argued the State's witnesses provided inconsistent statements about what happened on the night of March 28, 2015. This is not a sufficient reason to dismiss a case for lack of probable cause. When there is conflicting testimony at a preliminary hearing, a question of fact exists for jury determination, and the magistrate must make inferences in favor of the State. *State v. Whittington*, 260 Kan. 873, 875-72, 926 P.2d 237 (1996). This is so even when a single witness' statements are self-contradictory. See *State v. Chairez-Hernandez*, No. 105,174, 2012 WL 223923, at *3-5 (Kan. App. 2012) (unpublished opinion) (drawing inference in favor of State when witness' testimony at hearing differed from statements to police). Here, Officer Ratzlaff and Acosta provided conflicting testimony regarding what Acosta told the officer the night of the shooting. Vasquez also contradicted many of her earlier statements to police. This did not eliminate probable cause, however. These contradictions revealed questions of fact to be resolved at trial, and the district court was obligated to accept the testimony most favorable to the prosecution.

Vasquez and Jessica raise some doubts as to witness credibility and reliability. In determining probable cause, a magistrate must judge the credibility of witnesses called by either party. *State v. Wilson*, 267 Kan. 530, 535, 986 P.2d 365 (1999). However, "[d]oubts about the credibility of a witness do not require a judge, upon a preliminary examination, to discharge the accused as long as the doubts do not obviate the appearance that the accused probably committed the felony with which he or she is charged." 267 Kan. 530, Syl. ¶ 2. Vasquez said she was intoxicated on the day of the shooting, and she frequently contradicted herself. Jessica claimed to be able to make an identification of Carrasco based only on seeing his eyes at 11 p.m. at night while passing by in a car. Jessica was very confident in her identification, however, and there was enough evidence other than Vasquez' testimony that her credibility did not obviate Carrasco's appearance of guilt.

In reviewing the denial or granting of a motion to dismiss, we are concerned with whether there is sufficient evidence to support a finding of probable cause. The evidence at the preliminary hearing was sufficient to establish probable cause that Carrasco committed attempted first-degree murder. The evidence was also sufficient to demonstrate probable cause that Carrasco was involved in a conspiracy to commit first-degree murder. Thus, the district court's order granting the motion to dismiss is reversed.

The State addresses two more issues in its brief. However, there do not appear to be any cases where an appellate court has overturned the granting of a motion to dismiss for a reason other than there was sufficient evidence of probable cause. Thus, this issue appears to be dispositive in this case.

The State also argues the district court erred in applying a de novo standard of review to the preliminary hearing in issuing its order. The State contends that while K.S.A. 22-3610 provides for a de novo hearing of appeals before the district court, this statute does not apply to a magistrate's decision to bind a defendant over for trial. Thus, the district court improperly made a substantive disposition using de novo review, as well as addressing evidentiary issues. Additionally, the State asserts any errors at the preliminary hearing level were harmless.

In support of its argument, the State cites to a number of statutes regulating the appeal of orders to the district court. K.S.A. 2015 Supp. 20-302b grants magistrate judges the authority to conduct preliminary hearings in felony cases. K.S.A. 2015 Supp. 20-302b(a). This statute also provides that the district court must try and determine de novo any appeal from an order or final decision of a district magistrate judge who is not regularly admitted to practice law in Kansas "[i]n accordance with the limitations and procedures prescribed by law." K.S.A. 2015 Supp. 20-302b(c)(2). The Kansas Supreme Court has interpreted this statute to mean the State may appeal a magistrate's dismissal of a complaint to the district court, but it is not entitled to a de novo hearing due to the

14

limitations prescribed by other statutes. *State v. Kleen*, 257 Kan. 911, 914, 896 P.2d 376 (1995).

K.S.A. 22-3610 also states that when a case is appealed to the district court, the district court must try the case de novo. K.S.A. 22-3610(a). This statute, however, only applies to traffic, misdemeanor, and other convictions. *Kleen*, 257 Kan. at 914. It does not apply to a district magistrate judge's order binding or failing to bind a defendant over for trial. 257 Kan. at 914.

Relying on the above statutory authority, the State argues the district court erred in reviewing the magistrate's order de novo. The State's argument fails on numerous grounds. First, this case was not on appeal to the district court following a conviction. Carrasco filed a motion to dismiss pursuant to K.S.A. 2015 Supp. 22-3208. Thus, it was not subject to statutory authority regarding appeals.

Second, the State confuses a de novo review with a de novo hearing. All the previously cited statutory authority provides for de novo hearings at the district court level. There is no reference to a de novo standard of review. In this case, the district court clearly did not have a de novo hearing.

Finally, when the State appeals the dismissal of a complaint to the district court, it is not entitled to a de novo hearing. In reviewing the dismissal, however, the district court applies a de novo standard of review. *State v. Farmer*, 259 Kan. 157, 161, 909 P.2d 1154 (1996).

The State does not clarify what level of review it believes the district court should have used in ruling on Carrasco's motion to dismiss. As the State notes, however, the controlling legal standard at a preliminary hearing is that the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable

15

belief of the defendant's guilt. According to Kansas caselaw, "'[a] judge reweighing the preliminary examination evidence after arraignment and prior to trial must follow the standard for weighing the evidence as required for the preliminary examination.'" *State v. Phelps*, 266 Kan. 185, 193, 967 P.2d 304 (1998). Furthermore, when the State appeals the dismissal of a complaint to the district court, the district court must use a de novo standard of review to determine if the evidence is sufficient to support a finding of probable cause. *Farmer*, 259 Kan. at 161. This suggests when a district court rules on a motion to dismiss, it must reweigh the evidence and thus has unlimited review of the preliminary hearing record.

Additionally, the rules of evidence apply at a preliminary hearing, and a district court should only consider evidence admissible at trial in determining if probable cause exists. See *State v. Cremer*, 234 Kan. 594, 599-600, 676 P.2d 59 (1984); *State v. Jones*, 233 Kan. 170, 172, 660 P.2d 965 (1983). It follows that the court may consider whether a magistrate admitted certain evidence at the preliminary hearing that would not have been admissible at trial, at least when a party objected to that evidence. If the court finds the evidence is incompetent, it may then refuse to consider such evidence in making its determination.

In this case, the defendants entered multiple objections to various testimony. The magistrate overruled most of those objections. If the district court determined that the magistrate should have sustained the objections because the evidence was inadmissible, it should be able to disregard that evidence in determining probable cause.

Last, the State argues that any evidentiary errors that may have occurred at the preliminary hearing are harmless. It supports this argument by citing the rule that "[w]here an accused has gone to trial and been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is harmless unless it appears that the error caused prejudice at trial." *State v. Henry*, 263 Kan. 118, Syl. ¶ 9, 947 P.2d 1020 (1997).

16

The State reasons because this case never went to trial, it could not have caused prejudice at trial, therefore any error is harmless.

This is clearly an incorrect application of this rule. As stated in the rule itself, it applies *where a defendant has been found guilty beyond a reasonable doubt*. Since Carrasco has not been found guilty beyond a reasonable doubt, the rule is not applicable.

There is some merit, however, to the State's argument that the district court should have applied a harmless error standard to any evidentiary issues. In other jurisdictions that apply the rules of evidence at preliminary hearings, either in whole or with limited exceptions, erroneous admission of evidence does not lead to an automatic reversal of a bind over. Instead, if there is sufficient admissible evidence to support the bind over standard, the reviewing court will uphold the bind over. See, *e.g.*, *Waugh v. State*, 564 S.W.2d 654, 659 (Tenn. 1978); *State v. Reggio*, 84 S.D. 687, 690, 176 N.W.2d 62 (1970); *Pinizzotto v. Superior Court*, 257 Cal. App. 2d 582, 587-88, 65 Cal. Rptr. 74 (1968). Kansas courts have already applied a similar standard in ruling on motions to dismiss. See *State v. Crawford*, No. 103,524, 2011 WL 135033, at *2 (Kan. App. 2011) (unpublished opinion) (district court not considering evidence presented at preliminary hearing and later suppressed in ruling on motion to dismiss). Additionally, when reviewing evidence erroneously admitted at trial, Kansas courts apply a harmless error standard. *State v. Warrior*, 294 Kan. 484, 513, 277 P.3d 1111 (2012). This suggests if a court is going to review errors at the preliminary hearing level, that court should use a harmless error standard.

Finally, the State argues the district court erred in raising evidentiary errors from the preliminary hearing *sua sponte* in its ruling on Carrasco's motion to dismiss. Whether a district court erred in raising an issue *sua sponte* is reviewed for abuse of discretion. See *State v. James*, No. 105,768, 2012 WL 402014, at *6-7 (Kan. App. 2012) (unpublished opinion). A judicial action constitutes an abuse of discretion if the action (1)

17

is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Generally, a district court may not raise an issue *sua sponte* unless that issue is jurisdictional. *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources*, 237 Kan. 857, 864, 704 P.2d 12 (1985). Admission of hearsay and other similar evidentiary issues at a preliminary hearing are not covered by these statutes, nor do they affect jurisdiction. See *State v. Brown*, 299 Kan. 1021, 1030, 327 P.3d 1002 (2014) (errors in preliminary hearing are not jurisdictional errors), *overruled on other grounds by State v. Dunn*, 304 Kan ___, 375 P.3d 332 (2016).

In this case, Carrasco filed a motion to dismiss for lack of probable cause. As noted above, the legal standard for ruling on a motion to dismiss is whether there was sufficient admissible evidence to support a finding of probable cause. This suggests a district court may disregard evidence that was erroneously admitted at the preliminary hearing in making its probable cause determination. There does not appear to be any precedent, however, to dismiss a case solely because the magistrate committed evidentiary errors, regardless of whether these errors affected the finding of probable cause.

In its order, the district court found a number of facts regarding the incident. As the State points out, these facts are sufficient to support a finding of probable cause on Carrasco's attempted first-degree murder charge, though perhaps not his conspiracy charge. The district court continued by noting two examples of the magistrate's evidentiary errors.

The first is Vasquez' testimony that Carrasco said he had a "big ass dent" in his truck. As the district court admitted, this testimony was admissible against Carrasco. Thus, there does not appear to be any error here in regards to Carrasco.

18

Next, the district court pointed to another portion of Vasquez' testimony. The State asked her if she had asked Sanchez what he had done with the gun, and she responded "Yeah, but he got rid of it." The State then asked, "He said he got rid of it?" She answered, "Yeah, he said he got rid of it." Sanchez objected to her answer as nonresponsive. The State responded that Sanchez' objection was untimely, and the magistrate overruled the objection. The district court disagreed, noting the objection was timely and the answer should have been stricken from the record.

Neither of these errors appear to have led to the erroneous admission of incompetent evidence against Carrasco. The district court found the first incident was admissible against Carrasco. In the second incident, the district court and the magistrate disagreed over whether Sanchez' objection was timely, but the evidence presented would not clearly be inadmissible at trial. The State could have simply asked another question to elicit the same response.

In its order, the district court went on to note that these are just two examples of defense objections that the magistrate improperly ruled on. The court ultimately concluded that due to the evidentiary errors and the confusing nature of the evidence presented, there was no probable cause. This conclusion, however, conflicts with his factual findings that arguably establish probable cause, at least for Carrasco's murder charge. Nor does the court elaborate on whether the evidentiary rulings had any effect on the probable cause ruling itself.

In focusing on the errors of the magistrate, rather than whether the evidence at issue was admissible at trial and thus should be considered in its probable cause finding, the district court appears to have applied an incorrect legal standard. Furthermore, the district court raised this issue *sua sponte*. Even if one of the parties had raised the issue, the district court likely should have reviewed any errors for harmlessness. Because the

19

court raised this issue *sua sponte* and applied an incorrect legal standard in its review, the court abused its discretion.

In conclusion, there is evidence sufficient for a probable cause finding as to Carrasco's attempted first-degree murder charge and his conspiracy charge. The district court did not err in reviewing the preliminary hearing de novo in order to make its ruling on Carrasco's motion to dismiss, and the court can disregard evidence that would not be admissible at trial in making its probable cause determination. The court abused its discretion in raising the issue of evidentiary errors *sua sponte*, and basing its decision to grant the motion to dismiss partly on the existence of these issues, rather than apply a harmlessness standard.

We therefore reverse and remand with directions to reinstate the complaint.

Reversed and remanded with directions.