No. 115,227

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMY CLAERHOUT,
*Appellant*.

SYLLABUS BY THE COURT

1.

The material facts listed in K.S.A. 2016 Supp. 60-455 are exemplary rather than exhaustive, and a party can admit evidence to prove a material fact for a purpose not specifically listed in the statute.

2.

When determining whether a district court properly admitted K.S.A. 2016 Supp. 60-455 evidence, the court uses a multi-step process, asking (1) whether the fact to be proven was material; (2) whether the material fact was disputed and relevant to prove the disputed material fact; and (3) whether the probative value of the evidence outweighed the potential for undue prejudice against the defendant. The court reviews the first question de novo but reviews the second and third questions only for an abuse of discretion.

3.

The court does not independently determine issues which an appellant has abandoned or inadequately briefed.

1

4.

Multiple factors are relevant in showing a defendant's requisite state of mind in a depraved heart second-degree murder case. Those factors include intoxication, speeding, failing to aid the victim, and prior record of driving offenses.

5.

A defendant's prior record for reckless or intoxicated driving is relevant in a depraved heart second-degree murder case to establish that defendant had grounds to be aware of the risk his drinking and driving while intoxicated presented to others. That factor is relevant not only in examining the sufficiency of the evidence to find a defendant guilty of depraved heart second-degree murder, but also in examining the admissibility of K.S.A. 2016 Supp. 60-455 evidence.

6.

The fact that a defendant had a prior diversion for DUI tends to increase the probability that the defendant had subjective knowledge of the risks of driving while intoxicated. That fact is relevant to the question of whether defendant "consciously disregarded" that risk.

7.

The risk of undue prejudice turns not on whether the prior crime evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial.

8.

Appellate courts presume that juries follow the instructions given.

9.

Generally, the court applies the statutory harmless error standard to the erroneous admission of evidence unless some constitutional right is implicated. That analysis requires the reviewing court to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record.

10.

Errors related to the admission of statements given in violation of *Miranda* can be deemed harmless if the State can prove beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the record as a whole.

11.

Voluntary intoxication is a defense to specific intent crimes but is not a defense to general intent crimes.

12.

Defense of voluntary intoxication may be used only where the charged offense requires a specific intent. Voluntary intoxication is not a defense to a crime whose culpable mental state is "reckless."

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed October 27, 2017. Affirmed.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., POWELL and GARDNER, JJ.

GARDNER, J.: Jeremy Claerhout appeals his conviction of reckless second-degree murder. His conviction stems from a car crash he caused while driving under the influence (DUI) of alcohol, which resulted in the tragic death of Christopher Willdermood. Claerhout contends that the district court erred in four respects: (1) by admitting his prior DUI diversion agreement into evidence; (2) by allowing a police officer to testify as an expert accident reconstructionist; (3) by not suppressing certain statements he had made to a police officer following the crash; and (4) by not granting his request for an instruction on voluntary intoxication as a defense to reckless second-degree murder. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Around 10 p.m., on January 11, 2015, Claerhout caused a car crash while driving under the influence of alcohol. This crash resulted in the death of Willdermood. As a result, the State charged Claerhout with one count of reckless second-degree murder, a severity level 2 person felony in violation of K.S.A. 2014 Supp. 21-5403(a)(2), or alternatively, one count of involuntary manslaughter while driving under the influence, a severity level 4 person felony in violation of K.S.A. 2014 Supp. 21-5405(a)(3). The State also charged Claerhout with one count of reckless driving, a misdemeanor in violation of K.S.A. 8-1566.

Before his trial, Claerhout filed two motions. Claerhout's first motion challenged Officer Matt Misemer's intended testimony as an expert traffic accident reconstructionist based on the rules outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Misemer intended to testify about the speed and braking patterns of Claerhout's Ford F-150 truck and Willdermood's Mazda3 car based on the information he downloaded from each vehicle's airbag control module onto a computer program called Crash Data Retrieval (CDR). This computer program generated the speed and the braking patterns of the vehicles when they collided.

4

The district court determined that Misemer was qualified to testify as an expert accident reconstructionist.

In Claerhout's second motion, he contended that the statements he had made at the scene of the car crash should be suppressed under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The district court denied this motion, finding that although Officer Daniel Ubrik had interrogated Claerhout at the scene of the crash, he had no duty to give Claerhout the *Miranda* warnings because Claerhout was not yet in custody.

Claerhout also challenged the State's motion to admit his previous DUI diversion agreement into evidence. The district court ruled that the State could admit that agreement to show that Claerhout had acted recklessly with extreme disregard to the value of human life.

During Claerhout's trial, the State presented the testimony of the waitresses who had served Claerhout alcohol the day of the crash, the friends who had been with Claerhout on the day of the crash, the police officers who had responded to the crash, the bystanders who had witnessed the crash, and the doctors who had examined Willdermood. Highly summarized, the evidence established that from around 3 p.m. to 9 p.m. on January 11, 2015, Claerhout had been drinking alcohol at local bars. Based on the testimony of the waitresses who had served him and beverage receipts admitted into evidence, Claerhout had consumed five 12-ounce beers, three 24-ounce beers, one 32-ounce beer, and two vodkas during that time.

The crash occurred when Claerhout rammed his truck into the rear end of Willdermood's car while Willdermood was driving down Ridgeview Road in Johnson County, Kansas. The speed limit on this stretch of the road was 40 mph. Officer Misemer testified and the CDR report indicated that Claerhout's truck had been accelerating "100

5

percent" and traveling at a speed of 92 mph when he rammed Willdermood's car. The crash caused the truck's airbags to deploy. Misemer testified that the CDR reports showed that Willdermood had been driving about 47 mph when the crash occurred. Misemer believed that the force of the crash accelerated Willdermood's car to a speed of about 62 mph without any driver's input.

Officer John Mancayo, another accident reconstructionist, testified that the damage to Claerhout's truck and Willdermood's car showed that Claerhout had driven his truck almost squarely into the rear of Willdermood's car. This propelled Willdermood's car onto the grass on the right side of the road, where Willdermood's car ricocheted off a tree, then off a utility pole, and then crossed to the left side of the road before finally ramming into a wrought iron fence. The forensic pathologist who performed Willdermood's autopsy opined that Willdermood died from severe brain trauma that occurred because of rapid acceleration and deceleration, which was consistent with experiencing a serious car accident.

Claerhout's statements that he had consumed eight to nine beers that day and that he was at a level four drunk came into evidence through Officer Ubrik's testimony. Ubrik additionally testified that Claerhout failed the walk-and-turn test and the one-leg stand test and that Claerhout had a breath alcohol content (BAC) of .211, which was over twice the legal limit. In addition, the State admitted Claerhout's DUI diversion agreement from 2010 into evidence over Claerhout's objection.

Claerhout was charged with involuntary manslaughter as an alternative to reckless second-degree murder. He did not present any evidence on his own behalf. Instead, he conceded his guilt of involuntary manslaughter. In his opening statement, Claerhout's attorney admitted:

6

"[Claerhout] was incapable of safely driving a vehicle and he's as guilty as he can possibly be of involuntary manslaughter, but the State has decided to charge him with second-degree murder, and when you look at all the facts in this case and the knowledge of what he carried with him at that time as he drove that evening, we're confident that you won't find him guilty of that."

During the jury instruction conference, Claerhout requested an instruction on voluntary intoxication as a defense against the crime of reckless second-degree murder. The district court denied this request, ruling that voluntary intoxication can be used as a defense only against crimes that require a defendant to act with specific intent. The district court granted the State's request to instruct the jury that voluntary intoxication was not a defense against the crime of reckless second-degree murder.

The jury found Claerhout guilty on all counts. Because Claerhout was charged with involuntary manslaughter as an alternative to reckless second-degree murder, the district court vacated Claerhout's conviction for involuntary manslaughter. For his second-degree murder conviction, the district court sentenced Claerhout to 117 months' imprisonment followed by 36 months' postrelease supervision. The district court ran Claerhout's 30-day jail sentence for his reckless driving conviction concurrent with his second-degree murder sentence. Claerhout timely appeals.

DID THE DISTRICT COURT ERR BY ALLOWING THE STATE TO ADMIT CLAERHOUT'S PRIOR DUI DIVERSION AGREEMENT?

Claerhout first argues that the court erred by admitting into evidence his prior DUI diversion agreement because that agreement was not relevant and was more prejudicial than probative. We disagree.

*Applicable Law*

K.S.A. 2016 Supp. 60-455 governs whether evidence of a defendant's prior crime may be admitted at trial. That statute provides that although such evidence is inadmissible to prove a defendant's "disposition to commit crime or civil wrong as the basis for an inference that the [defendant] committed another crime or civil wrong on another specified occasion," such evidence is admissible when used to establish "'some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.'" "The material facts listed in K.S.A. 60-455 are exemplary rather than exhaustive, and a party can seek to admit evidence to prove a material fact not specifically enumerated." *State v. McCune*, 299 Kan. 1216, 1226-27, 330 P.3d 1107 (2014). The district court admitted Claerhout's prior DUI diversion agreement for the stated purpose of showing his state of mind—that Claerhout acted recklessly under circumstances manifesting extreme indifference to the value of human life.

When determining whether a district court properly admitted K.S.A. 2016 Supp. 60-455 evidence, courts engage in the following three-step test, with each step having its own standard of review:

> "• First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
> "• Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.
> "• Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value

8

of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion." *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012).

We apply this standard here, although we admit some confusion as to whether the relevance determination is to be reviewed de novo or for an abuse of discretion. Compare *State v. Preston*, 294 Kan. 27, 32, 272 P.3d 1275 (2012) (finding the court reviews the probative element of relevancy under an abuse of discretion standard) with *McCune*, 299 Kan. at 1227 (stating the court reviews the probative element of relevancy de novo, but citing *Preston*, 294 Kan. at 32). But see *State v. Rosa*, 304 Kan. 429, 436, 371 P.3d 915 (2016) ("'This court reviews the probative element of relevancy under an abuse of discretion standard.'").

Accordingly, we review the district court's determinations of relevancy and its balancing of probative value against prejudicial effect only for an abuse of discretion. "A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court, when the judicial action is based on an error of law, or when the judicial action is based on an error of fact." *State v. Seacat*, 303 Kan. 622, 634-35, 366 P.3d 208 (2016).

*Additional Facts*

In 2010, Claerhout had a prior DUI diverted. At that time, he had apparently been stopped because of a defective tail light and not because of any erratic driving. His diversion agreement listed numerous steps Claerhout was required to complete to get his DUI diverted, including attending educational courses on DUI and attending a victim impact panel.

9

Before trial, the State moved to admit evidence of Claerhout's DUI diversion agreement. The district court found that even though Claerhout's prior DUI was a "pretty garden-variety DUI," and did not involve the same erratic driving as alleged in this case, his prior DUI was relevant because it tended to show Claerhout had notice that drinking and driving was reckless. It found the evidence admissible to show Claerhout's state of mind—whether he acted with reckless disregard to the value of human life, stating:

"[W]ith respect to the State's 60-455 motion, I'm making the finding that the defendant's prior diversion for DUI is relevant to prove material fact, that being [that] the defendant acted with reckless disregard to the value of human life, that the defendant's statement of mind is a disputed fact, probably in this case the primarily disputed fact, and that the probative value of the evidence outweighs its prejudicial effect.

"This is one of the *Doub* factors which is specifically listed as relevant on the defendant's state of mind on a reckless second-degree murder.

"This is a diversion, it is not a conviction. It was five years ago.

"The defendant successfully completed the diversion and the Court will give an appropriate limiting instruction with respect to the purposes for which the jury may consider that evidence."

At trial, the court admitted Claerhout's 2010 DUI diversion agreement into evidence over Claerhout's objection. The district court ruled that Claerhout's previous diversion agreement for DUI was relevant to prove Claerhout's state of mind—whether Claerhout acted recklessly under circumstances manifesting extreme indifference to the value of human life.

The district court gave the jury the following limiting instruction, which Claerhout does not challenge:

"Evidence has been admitted tending to show that the defendant committed a crime other than the present crime charged. This evidence may be considered solely for

10

the purpose of determining whether or not the defendant acted with extreme indifference to the value of human life as alleged in Count I [second-degree murder].

Claerhout admits that his DUI diversion agreement was material and that whether he acted with extreme indifference to the value of human life was in dispute. See *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 (1976). Accordingly, we do not independently determine those issues. See *State v. Jones*, 298 Kan. 324, 329, 311 P.3d 1125 (2013) (If an appellant abandons an issue on appeal we need not proceed with our analysis or otherwise consider the issue); see also *State v. Bowen*, 299 Kan. 339, 356, 323 P.3d 853 (2014) (A litigant abandons an issue if the litigant fails to adequately brief the issue.).

Claerhout contends solely that the DUI diversion agreement was not relevant and that its prejudicial effect outweighed its probative value. We review both of these findings for an abuse of discretion. *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 379 (2012).

*Relevancy*

The district court's K.S.A. 2016 Supp. 60-455 analysis strictly followed the dictates of the statute, first determining that the agreement was material, then determining that the agreement was relevant to show Claerhout's state of mind, and then determining that the agreement was more probative than prejudicial. See *Torres*, 294 Kan. at 139-40. It did not treat Claerhout's prior DUI diversion agreement as automatically admissible or as an exception to the specific mandates of 60-455. Instead, its extensive 60-455 analysis is reflected in several of its rulings: (1) its ruling on the State's motion in limine regarding Claerhout's prior DUI diversion agreement, (2) its admission at trial of that agreement which specifically limited the scope of its use, (3) its jury instructions, and (4) its related ruling on Claerhout's motion to dismiss the second-degree murder charge.

11

In finding Claerhout's DUI diversion agreement relevant, the district court relied in part on *State v. Doub*, 32 Kan. App. 2d 1087, 1092, 95 P.3d 116 (2004). *Doub* found eight factors persuasive of the requisite state of mind in depraved heart second-degree murder cases, such as this one. Those factors included intoxication, speeding, failing to aid the victim, and prior record of driving offenses. As to the latter, *Doub* stated:

> "'8. *Prior record of driving offenses (drunk or reckless driving or both).* The relevance of a defendant's prior record for reckless or intoxicated driving is, as *United States v. Fleming* pointed out, not to show a propensity to drive while drunk but "to establish that defendant had grounds to be aware of the risk his drinking and driving while intoxicated presented to others."' Luria, *Death on the Highway: Reckless Driving as Murder*, 67 Or. L. Rev. 799, 823 (1988)." 32 Kan. App. 2d at 1092.

We find this factor relevant not only in examining the sufficiency of the evidence to find a defendant guilty of depraved heart second-degree murder, as in *Doub*, but also in examining the admissibility of 60-455 evidence.

Claerhout's DUI diversion agreement was probative of the proposition at which it was directed—that Claerhout acted recklessly under circumstances manifesting extreme indifference to the value of human life when he rammed his truck into the back of Willdermood's car. As part of Claerhout's diversion agreement, he was required to attend classes on DUI and treatment programs regarding alcoholism. One need not speculate about the substance of those classes—one can reasonably infer that the classes, to be fit for their intended purpose, would necessarily heighten the offender's awareness of the dangers of DUI. Claerhout's diversion agreement was thus relevant to show his heightened knowledge of the risks of driving under the influence—his state of mind.

Claerhout asserts that because his earlier DUI did not involve erratic driving, it had no logical tendency to prove that he acted recklessly. But the court made no inference from the underlying facts that gave rise to his previous DUI diversion. Those facts were

12

not in evidence. The inference of notice/knowledge/state of mind arises from the DUI diversion agreement itself because it required Claerhout to attend educational classes and a victim impact panel. Evidence that Claerhout had been arrested for DUI and was required to attend related educational classes tends to show his knowledge that driving while under the influence of alcohol is dangerous to others. That knowledge does not vary depending on the underlying acts that led to his diversion. He would have acquired the same knowledge regardless of whether his 2010 DUI was because he rammed another car while he was extremely drunk, as here, or because he was driving drunk without a working tail light, as there.

The district court implicitly recognized that the facts underlying Claerhout's previous DUI were dissimilar to those in the crime charged. But the district court did not admit his prior DUI to show that Claerhout had acted similarly on another occasion—that would be inadmissible propensity evidence. Instead it admitted the DUI diversion agreement to show that because Claerhout had been through a DUI diversion program, he had subjective knowledge that DUI was dangerous to others. This was proper.

The State notes many cases from other jurisdictions holding that prior DUI diversion agreements or convictions are properly admitted into evidence in a trial for second-degree murder for the purpose of showing knowledge or state of mind. The view of several courts, as summarized by the Tenth Circuit, is that "[a] jury could infer from Defendant's prior drunk driving convictions that he is especially aware of the problems and risks associated with drunk driving." *United States v. Tan*, 254 F.3d 1204, 1210 (10th Cir. 2001); see *United States v. Loera*, 923 F.2d 725, 729 (9th Cir. 1991); *United States v. Fleming*, 739 F.2d 945, 949 (4th Cir. 1984) ("[T]he driving record was relevant to establish that defendant had grounds to be aware of the risk his drinking and driving while intoxicated presented to others."). This is our view as well. As *United States v. New*, 491 F.3d 369, 375 (8th Cir. 2007), found:

13

"The issue in this case was not whether the conduct underlying New's prior convictions presented a serious potential risk of physical injury, but whether the fact that New sustained those convictions tended to make it more probable that he had knowledge of the risks of driving while intoxicated. The prior convictions were relevant, because '[o]ne who drives a vehicle while under the influence after having been convicted of that offense knows *better than most* that his conduct is not only illegal, but entails a substantial risk of harm to himself and others.' *Tan*, 254 F.3d at 1210 (emphasis in original) (internal quotation omitted). Whether or not New's prior convictions involved the underlying conduct of driving a vehicle is not dispositive. An offender who has been convicted and punished for operating a parked car while intoxicated would be acutely aware of the seriousness with which society treats drunk driving:  The risk of injury to others is so grave that even one who merely gets behind the wheel of a vehicle while intoxicated is subject to criminal sanction. Therefore, the district court did not abuse its discretion in concluding that New's prior DUI convictions were admissible to show knowledge under Rule 404(b)." 491 F.3d at 375.

Although Claerhout's prior DUI was not a conviction, the same rationale applies here. The fact that Claerhout underwent a diversion for DUI tended to make it more probable that he had subjective knowledge of the risks of driving while intoxicated. See *State v. Cavaner*, 206 Or. App. 131, 135, 135 P.3d 402 (2006) (past participation in a DUI diversion program is relevant to the issue of a defendant's subjective awareness of the risks associated with drinking and driving and "is relevant to the question of whether defendant 'consciously disregarded' that risk"), *abrogated on other grounds by State v. Brumbach*, 273 Or. App. 552, 359 P.3d 490 (2015); *State v. Johnstone*, 172 Or. App. 559, 567, 19 P.3d 966 (2001) (past participation in DUI diversion program is relevant to whether defendant has chosen to drive with a "subjective awareness of the risks to which he exposed others"). Evidence of Claerhout's prior DUI diversion agreement was thus relevant to prove that he acted recklessly under circumstances manifesting extreme indifference to the value of human life, an element of the charge of second-degree murder.

14

We find no abuse of discretion in the district court's finding that Claerhout's prior DUI diversion agreement was relevant. We would have reached that same result had we determined relevance de novo.

### Probative Value Versus Prejudicial Effect

Nor do we find an abuse of discretion in the district court's determination that the probative value of the exhibit outweighed its prejudicial effect.

As to that evidence, the district court expressly found "that the probative value of the evidence outweighs its prejudicial effect." We do not require a district court to explain with particularity the reasons underlying that conclusion. See *State v. Moore*, No. 109,787, 2014 WL 4231237, at *12 (Kan. App. 2014) (unpublished opinion) (noting our Supreme Court has not mandated the use of any factors or adopted any threshold requirement in balancing the probative value against the prejudicial effect of K.S.A. 60-455 evidence). It is even sufficient when the district court's analysis reflects its *implicit* determination that the probative value of the evidence outweighs its risk of undue prejudice. See, e.g., *State v. Remmert*, 298 Kan. 621, 628, 316 P.3d 154 (2014) (finding no abuse of discretion because the court's citation to one case and its conclusion that evidence of defendant's prior diversion agreement was admissible at trial "indicates that the court considered and determined that the probative value of the evidence outweighed the risk of unfair prejudice"), *disapproved of on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015); *Moore*, 2014 WL 4231237, at *12 (finding no abuse of discretion because the district court recognized that such balancing was appropriate under the statute, acknowledged the evidence was prejudicial, and stated why it decided to admit the evidence anyway—evidencing the court's implicit determination that the probative value of the evidence outweighed the risk of unfair prejudice).

The sole prejudicial effect alleged here is that the jury would be inclined to view the DUI diversion agreement as propensity evidence. But that same risk arises every time K.S.A. 60-455 evidence is admitted. "The risk of undue prejudice 'turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial.'" *State v. Perez*, 306 Kan. 655, 671, 396 P.3d 78 (2017) (quoting *State v. Dern*, 303 Kan. 384, 395, 362 P.3d 566 [2015]). Claerhout does not contend that admission of his prior DUI diversion agreement distracted from the central issues at trial, nor does the record indicate the jury could have been confused that the defendant was being prosecuted for the prior crime rather than the charged crime. See *State v. Lloyd*, 299 Kan. 620, 640, 325 P.3d 1122 (2014).

Any risk of undue prejudice flowing from the DUI diversion agreement here was adequately averted by two preventive measures taken by the district court: (1) its limiting instruction, which Claerhout does not challenge; and (2) its restriction on the State's scope of argument relating to the DUI diversion agreement, which strongly favored Claerhout.

First, the court properly limited the purpose for which the exhibit could be used by giving an appropriate limiting instruction:

> "Evidence has been admitted tending to show that the defendant committed a crime other than the present crime charged. This evidence may be considered solely for the purpose of determining whether or not the defendant acted with extreme indifference to the value of human life as alleged in Count I."

Appellate courts presume that juries follow the instructions given. *Perez*, 306 Kan. at 672. We do so here, as no evidence shows that the jury failed to abide by this instruction. See *State v. Wilson*, 295 Kan. 605, 621, 289 P.3d 1082 (2012). Nor does defendant contend the instruction was erroneous in any respect.

16

Secondly, the district court restricted the State to using the diversion agreement "simply [for] the fact that there was a diversion, period," but it expressly permitted Claerhout to raise additional information regarding that diversion, including what the underlying circumstances were:

> "This is a diversion, it is not a conviction. It was five years ago.
> "The defendant successfully completed the diversion and the Court will give an appropriate limiting instruction with respect to the purposes for which the jury may consider that evidence. The State may enter the agreement itself, unless the defendant wishes to stipulate to the existence of the diversion.
> "What we are not going to get into is going backwards in time to decide what things were taught to the defendant in his classes, which Victim Impact Panel he went to, who was present at that time, those kind of things.
> "Simply the admission of the diversion or if the defendant wishes to stipulate to keep the diversion agreement out.
> "If the defendant wishes to raise additional information regarding that diversion, what the underlying circumstances were, that kind of thing, that is in the defendant's bailiwick, but the State's not going to go into the underlying circumstances, simply the existence of the diversion."

Thus, Claerhout could have explained to the jury any underlying circumstances of his prior DUI, although the State could not have. Claerhout chose not to do so and also chose not to stipulate to the mere fact he had received a diversion for a previous DUI. Claerhout thus seeks to blame the district court for the natural consequences of his own choices.

The dissent finds certain statements made by the prosecutor to be prejudicial, but because Claerhout does not complain of those statements in his brief we should not address them. Regardless, the record shows that the prosecutor strictly adhered to the court's limitation and argued only those matters that were evident on and reasonably inferred from the face of the exhibit itself. ("Look at the diversion agreement. He was required to do a victim panel." "[L]ook at the diversion agreement in its entirety" because

17

it showed that Claerhout "was put on notice and he disregarded that knowledge" since "[n]o one knew better than Mr. Claerhout how much alcohol it took to raise his blood alcohol level to over the legal limit of .08.")

Similarly, the dissent takes issue with Instruction No. 13, which instructed the jury to consider the eight *Doub* factors and any other factors it found relevant in determining whether the defendant acted with extreme indifference to the value of human life. But Claerhout did not object to that instruction at trial and does not raise or argue this issue on appeal.

The record reveals no error of law or fact, and we cannot say that no reasonable person would take the view adopted by the trial court. Accordingly, we find no abuse of discretion in the district court's ruling that the probative value of the DUI diversion agreement outweighed its potential for undue prejudice against Claerhout. We affirm the admission of this evidence.

*Harmlessness*

We briefly address harmlessness because the dissent does so. The State contends that even if the district court abused its discretion in admitting the evidence, that error was harmless. Once we determine that the admission of 60-455 evidence was error, we must next consider whether that error was harmless under 60-261. See *State v. Greene*, 299 Kan. 1087, 1095, 329 P.3d 450 (2014) (erroneous admission of evidence is subject to review for harmless error). The harmless error analysis under K.S.A. 2016 Supp. 60-261 requires us to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *Perez*, 306 Kan. at 666 (citing *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 [2013]). Here, the State, as the party benefiting from the error, has the burden of demonstrating no reasonable probability that

the error affected the outcome of the trial in light of the entire record. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

This burden is easily met here because Claerhout has not controverted the State's well-developed argument that any error was harmless. Thus, we should find Claerhout has waived any argument that the error was prejudicial. See *Bowen*, 299 Kan. at 356; *Jones*, 298 Kan. at 329.

Additionally, although Claerhout does not contend that this error was constitutional in nature, the dissent does. The court should not raise an argument when the defendant does not do so. Further, the dissent does not specify what constitutional error was made, and the record reveals none. If any error occurred here it was merely the erroneous admission of evidence—not constitutional error. Cases addressing the erroneous admission of 60-455 evidence consistently use the statutory error analysis. See, e.g., *Torres*, 294 Kan. at 143-44; *State v. Gunby*, 282 Kan. 39, 58, 144 P.3d 647 (2006); *State v. Patton*, 280 Kan. 146, 173-74, 120 P.3d 760 (2005); *State v. Sanders*, 258 Kan. 409, 418, 904 P.2d 951 (1995); *State v. Miller*, No. 104,027, 2012 WL 1072753, at *5 (Kan. App. 2012) (unpublished opinion); *State v. White*, No. 94,716, 2007 WL 1964865, at *4 (Kan. App. 2007) (unpublished opinion). So should we.

Applying the statutory error analysis to the evidence, we find overwhelming evidence supporting Claerhout's conviction, even without the DUI diversion agreement. Claerhout does not challenge the facts. He and his friends began drinking approximately seven hours before the crash. They first drank at Lumpy's, then drove to and drank at Wallaby's bar, then drove to and drank at the Golden Nickel bar, and were driving back to drink more at Lumpy's when Claerhout's truck rammed into the back of Willdermood's Mazda a little after 10 p.m. The testimony of the waitresses, the testimony of Claerhout's friends, the testimony of officers at the scene, and Claerhout's .211 BAC results—over

19

two and one-half times the legal limit—indicate that Claerhout was highly intoxicated that night.

Claerhout was driving his Ford F-150 truck at the time. That truck weighed 5,750 pounds and had no throttle or brake problems. Claerhout was fully accelerating at the time of impact, meaning "the vehicle could not accelerate anymore. It was being given as much power as it had at the time to accelerate." Claerhout never used the brakes.

Claerhout was speeding—going 92 mph in a 40 mph zone—when he rammed squarely into Willdermood's Mazda, which was going 47 mph. Claerhout's truck hit the Mazda with tremendous force. An eyewitness described the Mazda, after Claerhout hit it, as flying past her at 90 mph. Claerhout's acts caused Willdermood to veer off the road, strike a tree, sever a utility pole in half, veer back across the opposite side of the road, and jump its curb. The Mazda traveled over 100 yards, then stopped only when it crashed into a wrought iron fence.

Claerhout's acts showed extreme indifference to human life. As the district court aptly stated:

> "[D]efendant was driving at . . . the time of the accident with a completely open throttle and no braking activity until the moment of impact.
>
> "The defendant's speed based upon the CDR was over twice the legal limit of 40 miles an hour. He was on a wet road at night in a suburban, residential neighborhood.
>
> "And in conjunction with that speed, the force of the defendant's vehicle was sufficient to propel the victim's vehicle to a resting point 282 yards from the point of impact.
>
> "And the victim's vehicle came to rest only after it sheered a tree and an electric pole in two, nor did the victim's vehicle stop of its own accord, but its forward momentum was stopped by a fence. This is a tremendous amount of force."

20

Claerhout's inaction immediately after the impact also shows his extreme indifference to the value of human life, as it is undisputed that at no time after Claerhout hit Willdermood's car did he make any effort to assist Willdermood. Two police officers testified that Claerhout could have and would have seen Willdermood's crashed car from where he parked his truck following the crash and from where they conducted the DUI investigation. Officer Brandon Hickel, the first police officer to contact Claerhout after the crash, testified that even though Willdermood's crashed car was in plain view, Claerhout had seemed "generally indifferent to the seriousness of that accident." Photos of the damage to Claerhout's truck show that Willdermood's back bumper was entangled in the grill of Claerhout's truck. Despite the fact that damage to his truck showed another vehicle had been involved in the crash, Claerhout never went to check on Willdermood's status. Instead, when police arrived, Claerhout remained seated in his truck, smoking one cigarette after another. He told an officer that he did not know what happened, did not know what he hit, and never suggested another vehicle was involved.

Claerhout admitted that his killing of Willdermood was done recklessly, since his attorney admitted Claerhout's guilt of involuntary manslaughter. Involuntary manslaughter, as charged, required proof of recklessness. See K.S.A. 2016 Supp. 21-5405(a) ("Involuntary manslaughter is the killing of a human being committed:  (1) Recklessly; . . . (3) in the commission of . . . [a DUI]." Second-degree murder, as charged, required proof of recklessness but also required proof of circumstances manifesting extreme indifference to the value of human life. See K.S.A. 2016 Supp. 21-5403(a) ("Murder in the second degree is the killing of a human being committed:  . . . (2) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."). Persons act "recklessly" when they "consciously disregard[] a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2016 Supp. 21-5202(j). See *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012) (finding a defendant acts recklessly as required

21

to be convicted of reckless second-degree murder when a defendant's actions resulted in "a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge the victim is in imminent danger, although death is not foreseen").

The State easily met its burden to show that Claerhout's killing of Willldermood was done under circumstances manifesting extreme indifference to the value of human life. See K.S.A. 2016 Supp. 21-5403(a)(2). This case is a classic example of a depraved heart murder. Thus, any error in admitting Claerhout's prior DUI diversion agreement was harmless.

## DID THE TRIAL COURT ERR BY ALLOWING OFFICER MISEMER TO TESTIFY AS AN EXPERT WITNESS?

Claerhout next contends that Officer Misemer was not qualified to testify as an expert because he lacked the "knowledge, skill, experience, training or education" required by K.S.A. 2016 Supp. 60-456(b). Claerhout asserts only that Misemer was unqualified because he could not explain the physical laws behind the formulas he used to calculate the speed Willdermood was driving when Claerhout rammed him with his truck. For purposes of expediency, we assume, without deciding, that Claerhout is correct in so arguing.

*Harmless Error*

An expert's qualifications are often stipulated to by the parties, and Kansas cases have not recently examined a district court's error in assessing an expert's qualifications. Accordingly, we have no direct guidance on how to review this claim of error. But the ultimate effect of such an error is to erroneously admit evidence in the form of an opinion. We review the improper admission of evidence for harmless error and ask

22

whether the State has shown no reasonable probability that the error affected the outcome of the trial in light of the entire record. *Perez*, 306 Kan. at 666. See *United States v. Yeley-Davis*, 632 F.3d 673, 685 (10th Cir. 2011) (finding district court abused its discretion in failing to make any findings on the record to support its decision to admit the expert testimony, but finding the admission of the expert's testimony was harmless).

We find any error resulting from the trial court's finding that Misemer was not qualified to testify as an expert to be harmless. Claerhout has not challenged the trial court's finding that the CDR reports upon which Misemer relied were admissible regardless of Misemer's qualifications to testify as an expert. He challenges only Misemer's qualifications to testify about his calculation that Willdermood was driving his car at a speed of about 47 mph when he was hit by Claerhout. Thus, our harmless error analysis hinges on the weight of that testimony in comparison to the other evidence admitted at Claerhout's trial.

That other evidence admitted at trial shows that the weight of Misemer's testimony that Willdermood had been driving about 47 mph when he was rammed was minimal. Claerhout's entire argument is that if Willdermood had been driving a different speed, the jury might have reached a different result because Willdermood's recklessness could have contributed to the crash.

That argument is mere speculation. Claerhout points to no evidence of Willdermood's recklessness or to any evidence that any of Willdermood's acts could have contributed to the crash. The only other evidence as to what speed Willdermood's car was going before Claerhout rammed it was the testimony of Hilda Avila, a bystander who saw Claerhout's truck and Willdermood's car pass her mere seconds before the crash. She testified Willdermood's car drove by "like any other vehicle would drive by" followed immediately by Claerhout's truck, which was "faster" and "right behind [Willdermood's car]." Thus, even without Misemer's testimony, the only evidence on point would have

23

shown that Willdermood was driving "like any other vehicle," i.e., at a normal speed that was close to the speed limit, while Claerhout was driving much faster and directly behind Willdermood. Accordingly, we find that the State has shown no reasonable probability that the error, if any, affected the outcome of the trial in light of the entire record.

Claerhout's argument also ignores other evidence of his guilt. As noted above, overwhelming evidence shows Claerhout's guilt of acting unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. Accordingly, even if Misemer was not qualified to opine that Willdermood was driving about 47 mph when Claerhout's truck rammed him, that error was harmless.

## DID THE TRIAL COURT ERR BY NOT SUPPRESSING CLAERHOUT'S STATEMENTS TO OFFICER UBRIK?

Claerhout next contends that the trial court erred by not suppressing his statements to Officer Ubrik that he had consumed eight or nine beers and was at a level four drunk. Claerhout contends that he was in custody when Ubrik asked him about his alcohol consumption so he was entitled to *Miranda* warnings, which were not given. The State counters that Claerhout was not in custody at the time, but that any error in not suppressing these statements was harmless.

Assuming, without deciding, that error occurred, we agree that any error is harmless. Errors related to the admission of statements given in violation of *Miranda* can be deemed harmless if the State can prove beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the record as a whole. *State v. Aguirre*, 301 Kan. 950, 962, 349 P.3d 1245 (2015), *cert. denied* 136 S. Ct. 895 (2016).

The State meets that burden here. Even without Claerhout's admissions about his beer consumption and level of drunkenness, the testimony from the waitresses, his

24

friends, the officers on the scene, and his .211 BAC results all show that he was highly intoxicated at the time he rammed his truck into Willdermood's car. Even if the trial court had suppressed Claerhout's admissions, the jury would have reached the same verdict because of other overwhelming evidence of Claerhout's guilt.

### DID THE TRIAL COURT ERR IN DENYING CLAERHOUT'S REQUEST FOR A JURY INSTRUCTION?

Claerhout's last argument is that the trial court erred by denying his request for an instruction that voluntary intoxication was a defense to reckless second-degree murder. Claerhout contends that this instruction was appropriate because it spoke to whether he could "consciously disregard a substantial and unjustifiable risk" as required to recklessly commit a crime. He thus argues that the trial court erred by providing the jury with an instruction stating that voluntary intoxication was not a defense to reckless second-degree murder. Claerhout contends this resulted in lowering the State's burden of proof.

When reviewing jury instruction challenges, we apply the following standard of review:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

25

The district court appropriately instructed the jury: "Voluntary intoxication is not a defense to any of the crimes with which the defendant is charged." This instruction was taken directly from PIK Crim. 4th 52.050 and is supported by our statute. See K.S.A. 2016 Supp. 21-5205(b).

Claerhout relies on *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015). *Kershaw* held that voluntary intoxication is a defense to specific intent crimes but is not a defense to general intent crimes. 302 Kan. at 781-82. Claerhout suggests that *Kershaw* left the door open to use voluntary intoxication as a defense to crimes that have "recklessly" as the requisite culpable mental state.

We find a significant problem with this argument. In *Kershaw*, our Supreme Court's review was limited to the issue of whether the trial court erred by instructing the jury that voluntary intoxication was not a defense to Kershaw's general intent crime. Yet, in analyzing this issue, our Supreme Court reiterated the rule that "voluntary intoxication defense is available *only* for specific intent crimes." (Emphasis added.) 302 Kan. at 778. See *State v. Hilt*, 299 Kan. 176, 192-93, 322 P.3d 367 (2014); *State v. Sterling*, 235 Kan. 526, 528-29, 680 P.2d 301 (1984).

Additionally, our court has squarely examined and repeatedly rejected the argument that voluntary intoxication is a defense to a crime whose culpable mental state is "reckless." See *State v. Spicer*, 30 Kan. App. 2d 317, 324, 42 P.3d 742 (2002); *State v. May*, No. 104,606, 2012 WL 1352827, at *2-3 (Kan. App. 2012) (unpublished opinion); *State v. Wise*, No. 95,076, 2007 WL 2580571, at *1-2 (Kan. App. 2007) (unpublished opinion). In *May* and *Wise* we rejected the argument that a defendant's voluntary intoxication can constitute a defense to reckless second-degree murder.

> "The statutory language, 'under circumstances manifesting extreme indifference to the value of human life' does not suggest any particular state of mind the offender must have

26

and that the State must prove as an element of reckless second-degree murder in order to convict. Rather, it describes the objective circumstances surrounding the event that must be present for the crime to have occurred." *May*, 2012 WL 1352827, at *2.

We approve the rationale expressed in *Spicer*, *May*, and *Wise*, and find that reckless second-degree murder is not a specific intent crime. See K.S.A. 2016 Supp. 21-5202(j).

We thus find no error in the district court's giving of this instruction.

Affirmed.

* * *

GREEN, J., dissenting: Admitting Claerhout's previous diversion agreement into evidence about his driving under the influence (DUI) offense conflicts with our Supreme Court decisions in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), and *State v. Boggs*, 287 Kan. 298, 197 P.3d 441 (2008). Consequently, I dissent from the majority's decision.

*Relevancy*

I have a problem with the majority's relevancy analysis because it maintains that Claerhout's DUI diversion agreement was relevant for a reason specifically prohibited by the district court in this matter. To illustrate, the majority states that Claerhout's DUI diversion agreement was relevant under K.S.A. 2016 Supp. 60-455 analysis for the following reasons:

> "The inference of notice/knowledge/state of mind arises from the DUI diversion agreement itself because it required Claerhout to attend educational classes and a victim impact panel. Evidence that Claerhout had been arrested for DUI and was required to attend related educational classes tends to show his knowledge that driving while under

27

the influence of alcohol is dangerous to others. That knowledge does not vary depending on the underlying acts that led to his diversion. He would have acquired the same knowledge regardless of whether his 2010 DUI was because he rammed another car while he was extremely drunk, as here, or because he was driving drunk without a working tail light, as there." *State v. Claerhout*, slip op. at 12-13.

Nevertheless, the district court clearly ruled that it was not admitting the DUI diversion agreement for the reasons stated by the majority. Indeed, in prohibiting the State from discussing any of Claerhout's diversion agreement conditions before the jury, the district court told the State that it was not allowed to go "down [that] rabbit hole." The district court explained: "What we are not going to get into is going backwards in time to decide what things were taught to the defendant in his classes, which Victim Impact Panel he went to, who was present at that time, those kinds of things."

When the State requested clarification on the district court's ruling, asking if it could "argue about the fact that the diversion agreement included certain classes and educational things," the district court responded: "Well, no. What, I'm wanting to get into is simply the fact that there was a diversion, period." The district court even suggested that if there was a journal entry simply stating that Claerhout had the DUI diverted without reference to the conditions of his DUI diversion agreement, it would prefer the admission of that document so there would be no reference to Claerhout's diversion conditions.

Moreover, the district court's determination for admitting the diversion agreement is completely different from the majority's relevancy determination. Thus, the district court ruled that the DUI diversion agreement was admitted *not to show Claerhout's awareness of the risks of DUI based upon the conditions of his agreement, but to show that Claerhout had simply committed an earlier DUI that had been diverted*. As stated earlier, the district court expressly ruled that although the State was allowed to admit the

28

DUI diversion agreement, the district court prohibited the State from presenting evidence or discussing the details about the DUI diversion agreement.

Turning to Claerhout's arguments regarding relevancy, I note that Claerhout repeats the arguments he made below regarding relevancy. He asserts that because his earlier DUI did not involve erratic driving, his previous DUI had no logical tendency to prove that he acted recklessly in his current DUI, which resulted in the second-degree murder offense. The district court ruled, however, that even though Claerhout's past DUI was a "garden variety" DUI, this court's *State v. Doub*, 32 Kan. App. 2d 1087, 1092, 95 P.3d 116 (2004), decision held that past DUIs are relevant. Thus, the district court considered Claerhout's previous DUI was relevant for K.S.A. 60-455 purposes.

The district court's and the majority's reliance on *Doub* is misplaced. *Doub* involved what relevant factors courts should consider when determining if *sufficient evidence* supported that a defendant had acted recklessly while committing a second-degree murder. 32 Kan. App. 2d 1087, Syl. ¶ 4. When the *Doub* court used the term "relevant," it was doing so not in the context of deciding whether K.S.A. 60-455 evidence was relevant to prove a disputed material fact. Indeed, K.S.A. 60-455 evidence was never even addressed in the *Doub* holding.

Significantly, the *Doub* holding predated our Supreme Court opinion in *Gunby*, where *Gunby* eliminated the frequent practice of admitting prior crimes evidence independent of a K.S.A. 60-455 analysis. In fact, the *Gunby* court declared: "Henceforth, admissibility of any and all other crimes and civil wrongs evidence will be governed by K.S.A. 60-455." 282 Kan. at 57. Moreover, the *Gunby* court warned: "Under this reinvigorated reading of K.S.A. 60-455, should a district judge neglect to apply the safeguards we have outlined to any other crimes or civil wrongs evidence, we will find error." 282 Kan. at 57.

29

Here, when the district court deemed Claerhout's earlier DUI was relevant, it merely stated that the earlier DUI was relevant because "[t]his [was] one of the *Doub* factors which is specifically listed as relevant on the defendant's state of mind on reckless second-degree murder." If we were to accept the district court's reasoning, it would eliminate any need to apply the safeguards mandated by *Gunby*. This would allow courts in cases like this to drift away from the K.S.A. 60-455 safeguards, which were anchored in the *Gunby* holding.

Indeed, based on the district court's strong reliance on the *Doub* holding, it instructed the jury to consider all eight of the *Doub* factors:

"Instruction No. 13

"The law provides no precise definition or exclusive set of criteria to determine whether a defendant acted with extreme indifference to the value of human life. However, the following factors may be considered by you, along with any other factors you find relevant, to determine whether the defendant acted with extreme indifference to the value of human life as alleged in Count I:

"1. Whether the defendant was intoxicated.

"2. Whether the defendant was speeding.

"3. Whether the defendant was involved in near or nonfatal collisions before the fatal accident.

"4. Whether the defendant was driving on the wrong side of the road.

"5. Whether the defendant failed to render aid to the victim.

"6. Whether the defendant failed to heed traffic signs or signals.

"7. Whether the defendant failed to heed warnings about reckless driving from other people prior to the fatal accident.

"8. Whether the defendant has a prior record for driving under the influence of alcohol or reckless driving.

"*State v. Doub*, 32 Kan. App. 2d at 1087."

30

As you can see, the *Doub* factors were loaded with prejudicial propensity evidence. The district court even cited to the *Doub* holding as the basis for this instruction.

The district court used the eight *Doub* factors similar to the way the district court used a PIK Criminal instruction in *Boggs*, 287 Kan. at 318. The *Boggs* case involved the nonexclusive possession of marijuana and drug paraphernalia.

During Boggs' trial, over his objection, the district court admitted evidence of Boggs' prior use of marijuana. Later, the district court gave the jury a modified PIK Crim. 3d 67.13-D instruction. This instruction told the jury that it could consider a defendant's use of a controlled substance as one of the factors in a nonexclusive possession case. Here, this district court used the eight *Doub* factors similar to the way the *Boggs'* district court used the PIK Criminal instruction. For example, in this case, the district court told the jury that it could consider the eight *Doub* factors to determine if Claerhout had acted with extreme indifference to the value of human life.

In considering the appropriateness of the PIK Criminal instruction, the *Boggs* court held that the instruction failed "to adequately summarize the nuances of this court's case law relating to K.S.A. 60-455 evidence." 287 Kan. at 318. Moreover, the *Boggs* court explained that its "decision in *Gunby* specifically bars the admission of any evidence of other crimes or civil wrongs independent of K.S.A. 60-455 or some other statutory basis." 287 Kan. at 318. As a result, the *Boggs* court declared:

> "While a defendant's use of a controlled substance may be admitted—subject to the requirements of K.S.A. 60-455—when such evidence is relevant to prove a disputed material fact, the defendant's use of a controlled substance is not a factor that is automatically admissible as an exception to the specific mandates of K.S.A. 60-455. To the extent that PIK Crim. 3d 67.13-D suggests otherwise, the instruction is disapproved. To the extent that past appellate cases in this state suggest otherwise, they are also disapproved." 287 Kan. at 318.

31

What our Supreme Court disapproved of in *Boggs*—the district court's use of the modified PIK criminal instruction—is what the district court did in this case when it used the eight *Doub* factors to instruct the jury. Moreover, like in *Boggs*, the *Doub* instruction in this case failed to adequately summarize the nuances of our Supreme Court's caselaw relating to K.S.A. 60-455 evidence. In addition, the *Boggs* court futuristically declared that to the extent that past appellate cases in this state suggest otherwise, they are also disapproved.

Although the majority correctly notes that Claerhout did not specifically object to Instruction No. 13 at trial, the majority ignores what our Supreme Court stated about Boggs' lack of objection at trial to the modified PIK criminal instruction: "Although Boggs did not object to the form of [the instruction at issue], he renewed his earlier objection to the admission of his statement to [an officer] that he had previously used drugs." 287 Kan. at 303. Evidently, Boggs' renewed objection to his prior drug use was sufficient to allow the *Boggs* court to consider on appeal the modified PIK criminal instruction. Likewise, Claerhout renewed his earlier objection to the admission of his previous DUI diversion agreement as K.S.A. 60-455 evidence when the State offered it for admission at trial. Thus, Claerhout's lack of an objection to Instruction No. 13 is analogous to Boggs' lack of an objection to the PIK criminal instruction, which the *Boggs* court considered and later disapproved the use of this instruction.

As stated earlier, the *Gunby* holding is an anchor and filter for the admission of propensity evidence. Because the *Doub*'s holding and the majority's holding would allow courts to drift away from the specific mandates of K.S.A. 60-455, it was error for the district court to instruct the jury on the eight *Doub* factors as it did.

Turning to the *Boggs* holding again, I note that although *Boggs* is distinguishable from this case since it involved a disputed material fact involving intent and this case involves a disputed material fact of extreme recklessness, the *Boggs* holding establishes

32

two things. First, in determining whether evidence is relevant for K.S.A. 60-455 purposes, district courts should analyze the similarities between the earlier crime and the crime at hand. See *State v. Moore*, 274 Kan. 639, 647, 55 P.3d 903 (2002); *State v. Higgenbotham*, 271 Kan. 582, 589, 23 P.3d 874 (2001) (emphasizing the importance of the similarity of past and current crimes). Second, the rules relevant in proving intent as explained in *Boggs* are equally applicable in proving extremely reckless behavior under K.S.A. 60-455. For example, if the fact is obvious from the mere doing of an act, or if the fact is conceded, evidence of other crimes to prove that fact should not be admitted because it serves no purpose to justify whatever prejudice it creates. *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 (1976).

After applying these rules to this case, I note that the facts surrounding Claerhout's earlier DUI are far different from the facts that occurred on the night Claerhout became intoxicated and collided his vehicle into Willdermood's car. As Claerhout has emphasized, his prior DUI did not involve erratic driving. Instead, it involved a defective tail light—an infraction which many people are cited for violating. It did not involve a car crash. It did not involve anybody being injured as a result of his driving. In fact, based on the district court's comment that Claerhout's earlier DUI was a "garden variety" DUI, the district court implicitly recognized that Claerhout's previous DUI was dissimilar to the DUI which resulted in his second-degree murder offense. As a result, Claerhout's earlier "garden variety" DUI did not involve the extremely reckless behavior required to substantiate a reckless second-degree murder conviction.

Next, both the State's and the majority's reliance on cases from other jurisdictions to show that Claerhout's DUI diversion agreement was properly admitted into evidence is also misplaced. Many of those cited authorities are factually distinguishable from Claerhout's case and are at variance with our caselaw establishing relevancy under K.S.A. 60-455. For example, several of the cases did not involve a challenge regarding the similarity of the earlier DUI with the DUI underlying the second-degree murder

33

charge as it related to proving relevancy: *United States v. Tan*, 254 F.3d 1204, 1209-13 (10th Cir. 2001); *United States v. Loera*, 923 F.2d 725, 729 (9th Cir. 1991); *United States v. Fleming*, 739 F.2d 945, 949 (4th Cir. 1984); *Jeffries v. State*, 169 P.3d 913, 924 (Alaska 2007); *People v. Brogna*, 202 Cal. App. 3d 700, 706, 248 Cal. Rptr. 761 (1988); *State v. Dushame*, 136 N.H. 309, 317, 616 A.2d 469 (1992); *Commonwealth v. Diehl*, 140 A.3d 34, 43 (Pa. Super. 2016). Moreover, the *Diehl*, *Jeffries*, and *Brogna* cases emphasized the fact the defendants had attended educational courses on the dangers of DUI as support for their respective findings that the defendants' past DUIs were relevant to prove recklessness on the current crime charged. Here, the district court expressly barred this kind of evidence from being discussed or admitted into evidence. As a result, the record is devoid of any facts of what Claerhout may have learned under the diversion agreement.

Regarding *State v. St. Clair*, 101 Haw. 280, 288, 67 P.3d 779 (2003), *Moorhead v. State*, 638 A.2d 52, 55 (Del. 1994), and *State v. Woody*, 173 Ariz. 561, 563, 845 P.2d 487 (1992), all of those cases spoke to the similarities between the defendants' earlier DUIs and the DUIs they had committed resulting in the death of the victims. Yet, unlike this case, in each of those cases, there was clear parity between the earlier and later DUIs. For example, both of the earlier DUIs in *St. Clair* and *Moorhead* involved actual car accidents. Furthermore, in *Woody*, the defendant's earlier DUI involved speeding past a police officer at 60 mph and refusing to stop his car for some time while his current crime also involved the defendant speeding "in excess of 60 [mph]" before hitting the victim's car head on. 173 Ariz. at 562.

Indeed, the only case that the State cites that is comparable to this case is *United States v. New*, 491 F.3d 369, 375 (8th Cir. 2007). This is also a case that the majority relies significantly on in support for its relevancy analysis. In this case, the defendant's earlier DUIs involved him sleeping behind the wheel of his stationary car. Relying on *Tan*, *Fleming*, and *Leora*, the *New* court rejected the defendant's argument that the earlier

34

DUI was too dissimilar to the DUI underlying his second-degree murder charge to be relevant on the material fact of knowledge that DUI was dangerous. Without much explanation, the *New* court ruled that the dissimilarities between the earlier DUI and the later DUI did not matter. 491 F.3d at 375. Nonetheless, the *New* court's finding is questionable because as stated in the preceding paragraphs, the *Tan*, *Fleming*, and *Leora* cases did not involve a comparison of the earlier DUI with the later DUI.

Moreover, one might substitute the following proposition for the *New* court's conclusion: For when individuals commit a run-of-the-mill DUI, one can safely say that it will lead to their knowledge that all DUIs, similar or dissimilar, are dangerous. The fallacy in this form of nondeductive reasoning is called a "hasty generalization." Conway and Munson, *The Elements of Reasoning*, p. 129 (1997). Thus, it would be impermissible to infer from a previous act of DUI by individuals that they would have knowledge or awareness that their conduct in a currently charged DUI was dangerous based only on their previous DUI, especially if their previous DUI did not involve any reckless behavior.

For the foregoing reasons, the previously cited cases will not bear nearly the weight of reliance which either the State or the majority places on them. Yet, when one compares Claerhout's prior DUI with the DUI which resulted in his second-degree murder offense, Claerhout's previous DUI was absent of any reckless conduct. For example, there was no evidence that Claerhout had acted in an extremely reckless manner in committing his prior DUI. Nor was there any evidence that he had placed the lives of others in danger while committing his previous DUI. Indeed, based on the district judge's own words at the evidential K.S.A. 60-455 hearing, Claerhout's earlier DUI was of a "garden variety." The only major factor distinguishing this case from our Supreme Court's reasoning in *Boggs* is the nature of the crime.

Consequently, Claerhout's previous DUI was of no legal relevance to whether his conduct showed an extremely reckless behavior. When K.S.A. 60-455 evidence does not logically tend to prove a disputed material fact, such evidence should be excluded because of the risk that the jury will give the evidence more weight than it should receive, unduly prejudicing the defendant. This is precisely "the harm that K.S.A. 60-455 was designed to prevent." *State v. Everett*, 296 Kan. 1039, 1047, 297 P.3d 292 (2013). Accordingly, the admission of Claerhout's prior DUI diversion agreement was error.

*Probative Value Versus Prejudicial Effect*

Next, I note that the district court never specifically analyzed the prejudicial effect of Claerhout's previous DUI diversion agreement in light of its probative value under the third step outlined in *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012). Under this third step, judges are to exclude any evidence which is more prejudicial than probative and to make sure that extremely prejudicial evidence of minimal value will not reach the jury. In *Gunby*, our Supreme Court explained that district courts must engage in a "particularized weighing of probative value and prejudicial effect." 282 Kan. at 57. Here, the district court never engaged in this particularized balancing of probative values against dangers of prejudice. Indeed, the district court never considered how the admission of Claerhout's DUI diversion agreement could prejudice his defense.

I also note that Claerhout adopted a negative defense when he conceded his guilt, during his attorney's opening statement to the jury, to the charge of involuntary manslaughter. If this was a civil case, some would characterize Claerhout's confession of involuntary manslaughter as a defense by confession and avoidance. Although Claerhout expressly conceded that sufficient facts existed to prove his guilt beyond a reasonable doubt of involuntary manslaughter, he denied that those same facts were sufficient to prove beyond a reasonable doubt that he committed second-degree murder. In theory,

36

the negative defense does not necessarily challenge the truth of the facts alleged, but rather their legal effect. Thus, the strength of a negative defense will depend upon a deficiency of the facts to substantiate the opponent's theory. Based on the thin margin of error for a successful negative defense, *it becomes incumbent on one who employs this kind of defense to have the jurors' attention focused on the relevant facts of the case rather than on any extraneous immaterial facts*.

As a result, Claerhout's negative defense was prejudiced beyond repair after the district court admitted into evidence his previous DUI diversion agreement. For example, Claerhout contended in his brief that the existence of the earlier DUI told the jury he "was a serial drunk driver who needed to be punished—either as a bad person or in order to keep him from committing future drunk driving crimes." The State attempts to minimize any prejudicial effect by asserting that the existence of the earlier DUI did not cause the jury to convict Claerhout of second-degree murder. Yet, a reasonable juror would naturally interpret the previous DUI as implying a propensity relationship between the two facts—Claerhout's prior DUI and the DUI which resulted in his second-degree murder offense—in tandem. Thus, the jurors' attention would no longer be focused on the relevant facts of the case but on Claerhout's DUI diversion agreement, which I will discuss later under the harmlessness analysis portion of this dissent.

In summary, the facts indicate that the evidence of Claerhout's earlier DUI were not relevant to prove the material fact in dispute, i.e., that Claerhout acted "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." As a result, the probative value of the previous DUI was substantially outweighed by its risk of prejudice, confusion, and distraction on the issue of whether Claerhout had acted "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."

*Harmlessness*

The majority opinion says that the erroneous admission of 60-455 evidence should not be analyzed under the constitutional harmless error standard because Claerhout did not contend that this error was of a constitutional nature. *Claerhout*, slip op. at 19. I disagree. Although the defendant's brief did not expressly state that he was raising a constitutional error concerning the erroneous admission of 60-455 propensity evidence, he explicitly contends that this propensity evidence denied him the basic requirement of due process in the following way:

> "[Claerhout's] Counsel acknowledges that a prior DUI might be relevant in some cases, particularly where the prior DUI involved reckless driving, injury, or some other combination of the *Doub* factors. However, as trial counsel argued below, under the specific facts of this case the prior DUI diversion did not put Mr. Claerhout on *notice* in such a way to support a finding that his subsequent driving under the influence amounted to reckless indifference.
>
> "In Mr. Claerhout's prior DUI diversion 'there was no evidence of reckless driving, there were no wrecks or near collisions, and there were certainly no injuries. He was stopped for a defective tail lamp.' There was nothing about the prior DUI diversion that would have put Mr. Claerhout on *notice* that his conduct was dangerous. In fact, the prior DUI diversion tends to show just the opposite—that Mr. Claerhout was capable of driving over the legal limit without putting others in danger." (Emphasis added.)

This is a constitutional due process contention. See *State v. Goodson*, 281 Kan. 913, 927, 135 P.3d 1116 (2006).

In applying both the constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), and the harmless error test of K.S.A. 60-261, the *Goodson* court explained the unsettled caselaw about whether due process is implicated when there has been an erroneous admission of propensity evidence:

"Most recently, the United States Supreme Court expressly reserved the question of whether admission of propensity evidence violates the Due Process Clause. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Given the unsettled state of the law and because we conclude that either test can be satisfied in this case, we will assume but not determine that due process is implicated and apply the dual standard of the *Chapman* constitutional harmless error test and the harmless error test of K.S.A. 60-261." 281 Kan. at 927.

Moreover, the error here is a constitutional error because the error infringed on Claerhout's federal constitutional right to a fair trial. *State v. Ward,* 292 Kan. 541, 570, 256 P.3d 801 (2011). Indeed, the United States Supreme Court once declared: "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955).

As a result, I will consider the improper admission of the DUI diversion agreement and the prosecutor's closing remarks to the jury about the importance of the diversion agreement in light of the entire record to determine if Claerhout was denied a fair trial. Importantly, under the constitutional harmless error standard, the party benefiting from the error must establish it was harmless. Moreover, the party benefiting from the error must convince the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569.

Turning now to the diversion agreement, I note that reasonable jurors would naturally regard the DUI diversion agreement to be an important piece of evidence. For example, when the DUI diversion agreement was admitted into evidence, the State conveyed to the jury that the agreement was very significant evidence. Moreover, when the district court admitted the DUI diversion agreement into evidence, over Claerhout's objection, the district court conveyed to the jury that this evidence was important. Thus, the jury undoubtedly believed that the agreement was significant evidence it should

39

consider when deliberating the degree of Claerhout's guilt. Finally, the very nature of the DUI diversion agreement would have placed this evidence in the forefront of the jurors' minds because Instruction No. 13 told them that they could use the DUI diversion agreement to determine if Claerhout was guilty of reckless second-degree murder.

The next question one must consider is how would the jury use the information within the diversion agreement in its fact-finding duty? The information contained within the DUI diversion agreement establishes at least two distinct ways the jury could have used the DUI diversion agreement. First, the jury could have used the DUI diversion agreement to infer Claerhout's guilt in this case based on his previous DUI offense. This is by its very nature propensity evidence.

Second, the jury could have focused on the express conditions of Claerhout's diversion agreement—like his education courses, victim panel, and treatment programs— as evidence that Claerhout had seriously injured someone before his current DUI, which resulted in his second-degree murder offense. Thus, the jury would have considered *the very evidence the district court had deemed irrelevant and improper while deliberating Claerhout's guilt on his second-degree murder charge*.

There is no question that the jury considered the conditions of Claerhout's DUI diversion agreement in its fact-finding process. For example, during the jury's deliberation, we actually know that the jury was considering facts not in evidence concerning the DUI diversion agreement. The jury foreperson asked the district judge the following question: "Did Mr. Claerhout complete diversion successfully?" The trial court responded that it could not provide the jury with any further information. Thus, we know that one or more of the jurors considered the DUI diversion agreement to be important enough in their deliberations to ask the district court if Claerhout had successfully completed his diversion agreement.

40

Moreover, the judge's response to the jury's question could have caused some jurors to consider the judge's response as unfavorable for Claerhout. Some jurors could have thought if Claerhout had successfully completed his diversion, they would have been told of this fact. After all, they were allowed to consider his diversion agreement as it related to his offenses. Because Claerhout had successfully completed his diversion agreement and the jury was not told of this fact, this may have harmed his defense in the eyes of the jury.

Once again, when the district court allowed the State to admit Claerhout's DUI diversion agreement into evidence, it stated the State could use the diversion agreement "simply [for] the fact that there was a diversion, period." The district court explained to the State: "What we are not going to get into is going backwards in time to decide what things were taught to the defendant in his classes, which Victim Impact Panel he went to, who was present at that time, those kind of things." Yet, what did the prosecutor tell the jury during her rebuttal argument? The prosecutor told the jury, "Look at the diversion agreement. He was required to do *a victim panel*." (Emphasis added.) The prosecutor further told the jury during her closing argument to "look at the diversion agreement in its entirety" because it showed that Claerhout "was put on notice and he disregarded that knowledge" since "[n]o one knew better than Claerhout how much alcohol it took to raise his blood alcohol level to over the legal limit of .08."

Claerhout had notice and knowledge of what? Because of the district court's ruling prohibiting any facts about what Claerhout may have learned under his diversion, the record is devoid of any facts concerning notice and knowledge. As a result, anything the prosecutor said about notice or knowledge is based on pure supposition. As you will see, Claerhout's education and treatment plan under his diversion agreement was composed of imperative sentences. For example: "Defendant shall attend the DUI victim impact panel and provide verification to his/her Court Services Officer within one hundred eighty (180) days of today's date" and "Defendant shall complete Level II continuing education

41

classes as scheduled by his/her assigned Monitor." As imperative sentences, they are commands. Moreover, as commands, they can be made only in the present time. Thus, these imperative sentences tell us absolutely nothing about what Claerhout learned from attending the previously mentioned classes.

Indeed, not knowing what Clearhout actually learned from the before mentioned classes may have been the reason for the jury's question: Did Claerhout successfully complete his diversion? In any event, one cannot assert anything factual about the victim impact panel and the education classes.

To summarize, the prosecutor's closing and rebuttal arguments revolved around the propensity inference from the admission of the diversion agreement. The prosecutor expressly told the jury to consider the conditions within the diversion agreement as evidence that Claerhout had acted recklessly under circumstances manifesting an extreme indifference to the value of human life. In doing so, the prosecutor violated the district court's rule which barred the use of the diversion agreement in this way. Moreover, the prosecutor told the jury to use the diversion agreement in a manner that the district court had specifically forbade. This allowed the prosecutor to make suggestions to the jury which had no real basis in fact. Indeed, this permitted the jury to believe that certain facts had been proven when, in reality, they were nonexistent in the record.

Additionally, Claerhout had no opportunity to respond to one of the prosecutor's most harmful remarks about his diversion agreement because it was made during the prosecutor's rebuttal argument. As I explained in the preceding section, Claerhout adopted a negative defense. Therefore, it was incumbent upon Claerhout's attorney during closing arguments to bring the jurors' attention to the relevant facts of Claerhout's defense, that is, although Claerhout was guilty of involuntary manslaughter, he was not guilty of reckless second-degree murder because his conduct lacked the extremely reckless behavior required to substantiate a reckless second-degree murder conviction.

This was why, after focusing on the facts, Claerhout's attorney ended his closing arguments by telling the jury the following:

"My client's guilty.

"He's not trying to avoid his responsibility.

"He's not guilty of second-degree murder, and that's what we're here about.

"I'd ask you to go back there and please consider the evidence, make a finding that the State just didn't meet their burden of proof beyond a reasonable doubt as to each and every claim they're required to prove on the second-degree murder charge, and find my client not guilty."

Nevertheless, the prosecutor wholly undermined Claerhout's attorney's efforts during her rebuttal closing arguments by telling the jury: "Look at the diversion agreement. He was required to do a victim panel." This was pure sophistry on the part of the prosecutor. It allowed the prosecutor to imagine or portray to the jury that Claerhout had injured someone in his previous DUI offense in lieu of the actual situation where no such injury or harm had occurred in his previous DUI offense.

What is more, the State's entire harmlessness arguments focused on its belief that overwhelming evidence supported Claerhout's conviction. The State correctly notes that the record indicates Claerhout was driving his vehicle at 92 mph in a 40 mph zone when he collided into Willldermood's car; that Claerhout was DUI when this collision occurred; and that he had a BAC of .211, which was over two and one-half times the legal limit. Claerhout does not challenge these facts. He challenges the legal effect of these facts: Whether these facts proved beyond a reasonable doubt that his killing of Willldermood was done "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." See K.S.A. 2016 Supp. 21-5403(a)(2).

The crime of second-degree murder under K.S.A. 2016 Supp. 21-5403(a)(2) covers homicides resulting from extremely reckless behavior, and the crime is patterned

43

after the Model Penal Code. See Tonkovich, *The Kansas Criminal Code*: *1992 Amendments*, 41 Kan. L. Rev. 73, 77 (Crim. Proc. ed. 1993). Professor Emil Tonkovich states that this kind of extremely reckless murder is called a depraved-heart murder. Moreover, he states that a majority of the states recognize this form of murder. In observing where a depraved-heart murder fell between the crimes of felony murder and involuntary manslaughter, Professor Tonkovich stated:

> "In felony murder cases, the commission of the underlying felony provides the extreme recklessness required for criminal liability. In involuntary manslaughter cases, the commission of the underlying unlawful act or the reckless conduct provides the necessary recklessness. Depraved-heart murder, in terms of degree, falls between felony murder (first degree murder) and involuntary manslaughter. . . . [T]his extremely reckless conduct is at least as dangerous to human life as most felony murder situations." 41 Kan. L. Rev. at 78.

Claerhout's fate hung on the jury's focus remaining on the facts surrounding the collision. The improper admission of Claerhout's DUI diversion agreement and the prosecutor's explicit instruction to the jury to draw the inference that Claerhout had harmed someone in his previous DUI offense shattered his confession and avoidance defense. I cannot characterize the admission of Claerhout's DUI diversion agreement and the prosecutor's closing and rebuttal arguments as anything other than an invitation to the jury to infer Claerhout's guilt in this case based on his previous DUI offense and on his prior DUI diversion agreement. Because the State benefited from those errors, it was the State's burden to convince this court "beyond a reasonable doubt that the error[s] complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error[s] affected the verdict." *Ward*, 292 Kan. at 569. I cannot hold that the State met its burden here.

Thus, I cannot hold beyond a reasonable doubt that (1) the admission of Claerhout's DUI diversion agreement and (2) the prosecutor's closing argument where she

44

made unsupported suggestions to the jury about the meaning of Claerhout's DUI diversion agreement had no unfair prejudicial effect on the jury's verdict in this case. To the contrary, the improper admission of the DUI diversion agreement and the prosecutor telling the jury to look to the conditions of the diversion agreement, especially the condition concerning the completion of a victim impact panel, fatally infected the trial. As a result, I would hold that this absence of fairness denied Claerhout due process and a fair trial.